# 15-985

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

v.

JOHN G. ROWLAND,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of Connecticut, No. 3:14-cr-79 (JBA)

## BRIEF FOR APPELLANT

Andrew L. Fish
R. James DeRose, III
LOCKE LORD LLP
3 World Financial Center
New York, NY 10281
(212) 415-8541
afish@lockelord.com

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iv

PRELIMINARY STATEMENT .......................................................1

JURISDICTION..............................................................................4

STATEMENT OF THE ISSUES.......................................................4

STATEMENT OF THE CASE...........................................................5

    A.    Background ...............................................................5

        1.    The Charges ...................................................5

        2.    The Draft Contract Rejected by Greenberg in 2009..................6

        3.    Rowland's Work for Wilson-Foley's Campaigns and Foley's Offer of a Position at Apple........................8

        4.    Rowland's Contract for His Work at Apple ...........................10

        5.    Rowland's Work at Apple .......................................11

        6.    Rowland's Role in the Wilson-Foley Campaign .....................12

        7.    Rowland Ends His Relationships with the Campaign and with Apple.........................................12

    B.    The Government Investigation and Foley's Cooperation .................13

    C.    Pretrial Proceedings......................................................14

    D.    The Trial ...................................................................15

    E.    The Verdict and the Denial of Rowland's Rule 29 Motion ...............17

    F.    The Posttrial *Brady* Litigation...........................................17

        1.    Wilson-Foley's Sentencing Memorandum Reveals Undisclosed Exculpatory Information ......................17

        2.    The Affidavit from Wilson-Foley's Counsel and the Government's Submission ...................................19

        3.    The District Court Denies an Evidentiary Hearing...................21

        4.    Rowland's New Trial Motion ..................................21

      5.    The District Court Denies Relief ..............................................22

  G.    Sentencing and the Granting of Bail Pending Appeal ......................23

SUMMARY OF ARGUMENT ............................................................23

STANDARDS OF REVIEW .............................................................27

ARGUMENT ..................................................................................28

I.    The Conviction Should be Reversed Because Rowland Did Not Violate Section 1519 ....................................................................28

  A.    The Section 1519 Charges .....................................................28

  B.    The Government Did Not Prove that Rowland Violated Section 1519 ...................................................................................28

      1.    The Draft Contract Rejected by Greenberg Was Not "Falsified" .....................................................................30

      2.    The Contract with Shelton Was Not "Falsified" ....................35

  C.    The Jury's Verdict on All Counts Should Be Vacated Because of Prejudicial Spillover .........................................................35

II.    The Conviction Should Be Vacated Because of the Government's *Brady* Violation ........................................................................39

  A.    The Government's *Brady* Obligations ...................................40

  B.    The Government Violated Its *Brady* Obligations by Failing to Disclose Wilson-Foley's Statements ..........................................42

      1.    Wilson-Foley's Statements to the Government Were Suppressed ....................................................................42

      2.    Wilson-Foley's Statements to the Government Were Favorable to the Defense and Material ...................................44

III.    The Conviction Should Be Vacated Because of Erroneous Jury Instructions ..............................................................................49

  A.    The District Court Erroneously Changed the Theory of the Defense .............................................................................50

  B.    The District Court Erroneously Declined To Instruct the Jury that Candidates May Personally Pay Campaign Staff ......................52

  C.    The District Court Erroneously Instructed the Jury on the Government's Section 1519 Omission Theory ...............................53

IV.   The Conviction Should Be Vacated Because of Serious Evidentiary
      Errors ........................................................................................... 53

      A.    The District Court Erroneously Excluded Rowland's
            Communications with Apple ................................................ 54

      B.    The District Court Erroneously Admitted Opinion Testimony
            Regarding the Meaning of Rowland's Emails .................... 56

      C.    The District Court Erroneously Admitted Hearsay and Opinion
            Testimony from Katz and Fischer ...................................... 57

V.    The Limits on Individual Campaign Contributions Are
      Unconstitutional .......................................................................... 59

VI.   The District Court Erred in Calculating the Guidelines Offense Level ........ 60

      CONCLUSION .............................................................................. 61

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Brady v. Maryland*,
    373 U.S. 83 (1963)...................................................................passim

*Buckley v. Valeo*,
    424 U.S. 1 (1976).........................................................................60

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)....................................................................33

*Hong Mai Sa v. Doe*,
    406 F.3d 155 (2d Cir. 2005) .......................................................13

*Johnson v. United States*,
    135 S. Ct. 2551 (2015)................................................................34

*Kolender v. Lawson*,
    461 U.S. 352 (1983)....................................................................34

*Lewis v. Connecticut Commissioner of Corrections*,
    790 F.3d 109 (2d Cir. 2015) ..................................................41, 42

*McCutcheon v. FEC*,
    134 S. Ct. 1434 (2014)............................................................47, 59

*Randall v. Sorrell*,
    548 U.S. 230 (2006)....................................................................47

*Strickler v. Greene*,
    527 U.S. 263 (1999)....................................................................41

*Tome v. United States*,
    513 U.S. 150 (1995)....................................................................58

*United States v. Allen*,
    127 F.3d 260 (2d Cir. 1997) .......................................................50

*United States v. Bah*,
    574 F.3d 106 (2d Cir. 2009) .......................................................50

*United States v. Blankenship*,
    382 F.3d 1110 (11th Cir. 2004) ..........................................29, 30, 35

*United States v. Bruno*,
    383 F.3d 65 (2d Cir. 2004) .........................................................36

iv

*United States v. Certified Environmental Services, Inc.*,
  753 F.3d 72 (2d Cir. 2014) ...................................................54

*United States v. Douglas*,
  525 F.3d 225 (2d Cir. 2008) .........................................27, 41

*United States v. Ferguson*,
  676 F.3d 260 (2d Cir. 2011) .................................................27

*United States v. Garcia*,
  291 F.3d 127 (2d Cir. 2002) .................................................56

*United States v. Goldson*
  954 F.2d 51 (2d Cir. 1992) ...................................................50

*United States v. Gomez*,
  617 F.3d 88 (2d Cir. 2010) .............................................57, 58

*United States v. Grinage*,
  390 F.3d 746 (2d Cir. 2004) ...........................................56, 57

*United States v. Hamilton*,
  334 F.3d 170 (2d Cir. 2003) .................................................36

*United States v. Kleiner*,
  765 F.3d 155 (2d Cir. 2014) .................................................27

*United States v. Mahaffy*,
  693 F.3d 113 (2d Cir. 2012) ...........................................passim

*United States v. Novak*,
  443 F.3d 150 (2d Cir. 2006) .................................................27

*United States v. Scheer*,
  168 F.3d 445 (11th Cir. 1999) .............................................46

*United States v. Triumph Capital Group, Inc.*,
  544 F.3d 149 (2d Cir. 2008) ...........................................41, 48

*United States v. Vilar*,
  729 F.3d 62 (2d Cir. 2013) ...................................................27

*Yates v. United States*,
  135 S. Ct. 1074 (2015).....................................................passim

*Youngblood v. West Virginia*,
  547 U.S. 867 (2006)...........................................................41

## STATUTES, RULES & OTHER AUTHORITIES

2 U.S.C. § 441a(a)(1)(A) ...................................................59

18 U.S.C. § 1001 ...............................................................43

18 U.S.C. § 1519 ...............................................................28

18 U.S.C. § 3231 .................................................................4

28 U.S.C. § 1291 .................................................................4

52 U.S.C. § 30101(8)(B)(i) ................................................47

52 U.S.C. § 30116 .............................................................59

U.S.S.G. § 2C1.8 ..............................................................60

11 C.F.R. § 100.52 ............................................................46

11 C.F.R. § 100.52(d)(1) ..............................................31, 52

11 C.F.R. § 100.54 ............................................................47

11 C.F.R. § 100.74 ............................................................47

11 C.F.R. § 100.111(e)(1) .............................................31, 52

11 C.F.R. § 104.13 .......................................................31, 52

11 C.F.R. § 110.10 .......................................................31, 52

Fed. R. Evid. 404(b)(1) .....................................................38

Fed. R. Evid. 801(d)(B)(1) ................................................58

Black's Law Dictionary 720 (10th ed. 2014) .................32, 33

## PRELIMINARY STATEMENT

When the Government learned that former Connecticut Governor John Rowland volunteered for a congressional campaign while working as a paid consultant for a company owned by the candidate's husband, it was all too eager to prosecute. But the Government secured Rowland's conviction on campaign finance-related charges only by (1) seeking an unprecedented expansion of the scope of a narrow "anti-shredding" statute, (2) concealing exculpatory evidence it viewed as damaging to its case, (3) preventing the jury from receiving accurate instructions on the requirements of campaign finance laws and the theory of the defense, and (4) convincing the District Court to make a series of one-sided evidentiary rulings that prejudiced Rowland's defense. In light of the numerous flaws in the proceedings, Rowland's conviction cannot stand.

The Government expanded the scope of 18 U.S.C. § 1519 ("Section 1519"), a narrow "anti shredding" provision of the Sarbanes-Oxley Act, to criminalize contract drafting. Rowland was convicted of violating Section 1519 for presenting congressional candidate Mark Greenberg with a draft contract proposal in 2009, a proposal that Greenberg immediately rejected. Because the rejected draft contract did not expressly mention campaign work, the Government charged that the draft was "falsified" in violation of Section 1519. But no contract, let alone a draft

contract proposal that was immediately rejected, can constitute the sort of "falsified" document criminalized by Section 1519.

The Government resorted to this unprecedented and unfounded Section 1519 charge to shore up a prosecution that was hollow at its core. Although Rowland faced a charge for proposing a contract to Greenberg in 2009, this case centered on Rowland's work for the 2012 congressional campaign of Lisa Wilson-Foley. While working for Wilson-Foley's campaign as a volunteer, Rowland was a paid consultant for Apple Rehab ("Apple"), the nursing home company owned by Wilson-Foley's husband, Brian Foley. The Government alleged that Rowland's consulting fees ($5,000 per month; $35,000 in total) were actually illegal payments for campaign work.

Foley was the Government's star witness, but he testified pursuant to an extraordinary plea deal. In exchange for his testimony against Rowland, the Government (1) agreed not to prosecute Foley for numerous campaign finance felonies that had nothing to do with Rowland and instead allowed Foley to plead guilty to a single misdemeanor, (2) agreed that Foley's wife (Wilson-Foley) could plead guilty to a single misdemeanor and (3) agreed not to prosecute Foley's friends and other family members for their participation in Foley's illegal campaign contribution schemes. This highly favorable plea offer created a strong incentive for Foley to falsely implicate Rowland in wrongdoing. As a result, the

2

Government needed to bolster Foley's testimony with evidence offered on the baseless Greenberg-related Section 1519 charge.

The Government also prejudiced Rowland's defense by concealing that, even in the face of Government threats, Wilson-Foley refuted the Government's theory of the case. During a Government interview, Wilson-Foley said that she believed Rowland was hired for a real job at Apple. Even after the Government said it would revoke her husband's favorable plea offer, Wilson-Foley steadfastly refused to change her account. The prosecutors complained to Wilson-Foley's attorney that her refusal to change her account had done "damage" to their case. But the prosecutors then ensured that no harm would be done to their case by hiding Wilson-Foley's statements from the defense. Had Rowland known of Wilson-Foley's exculpatory statements and the Government's threats, there is a reasonable probably that Rowland's trial would have had a different outcome.

The flaws in the proceedings do not end there. The District Court erred in instructing the jury on the theory of the defense, and the Court wrongly declined to instruct the jury on critical provisions of campaign finance law. In addition, the District Court made a series of erroneous evidentiary rulings that prejudiced Rowland's defense. The Court wrongly excluded emails and other evidence showing that Rowland believed he was being paid to work for, and did in fact work for Apple. The Court also erroneously allowed Government witnesses to offer

3

hearsay testimony and to opine about the purported meaning of Rowland's emails and the propriety of Rowland's actions. The District Court's asymmetrical interpretation of the rules of evidence deprived Rowland of a fair trial.

Because Rowland did not violate Section 1519, his convictions for violating that statute should be reversed. In light of prejudicial spillover from the Section 1519 evidence, the Government's concealment of Wilson-Foley's exculpatory statements, and the District Court's erroneous jury instructions and evidentiary rulings, Rowland's convictions on the remaining counts cannot stand.

## JURISDICTION

The District Court had jurisdiction under 18 U.S.C. § 3231. The District Court entered final judgment on March 26, 2015. Rowland filed a timely notice of appeal on March 30, 2015. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether Section 1519 prohibits the drafting of a contract proposal that is immediately rejected or the signing of a contract when (1) neither the rejected draft contract proposal nor the executed contract were altered and (2) neither contained false statements of historical fact.

2.      Whether the District Court erroneously ruled that the Government did not have an obligation under *Brady v. Maryland* to disclose exculpatory statements

4

of an alleged coconspirator that directly contradicted the Government's theory of the case.

3. Whether the District Court erred by (a) mischaracterizing the theory of the defense in its jury instructions, (b) refusing to instruct the jury on relevant aspects of campaign finance law, and (c) instructing the jury regarding the Government's Section 1519 omission theory.

4. Whether the District Court abused its discretion by (1) excluding evidence that Rowland believed he was being paid to work for and did, in fact, work for Apple, (2) allowing cooperating witness Foley to opine about the meaning of Rowland's emails, and (3) permitting confederates of candidate Greenberg to testify about what Greenberg told them and to opine that Rowland's alleged proposal "didn't smell right."

5. Whether individual campaign contribution limits are unconstitutional.

6. Whether Rowland's sentence was procedurally unreasonable because the District Court erroneously calculated the Guidelines offense level.

## STATEMENT OF THE CASE

### A. Background

#### 1. The Charges

Rowland appeals from a judgment of conviction and sentence entered by the United States District Court for the District of Connecticut (Arterton, J.) after a jury trial.

5

The charges in the seven count superseding indictment related to two different congressional campaigns. Count One charged that Rowland violated Section 1519 by "falsif[ying] and ma[king] material false entries in" a draft contract proposal that he presented to Greenberg in October 2009. (A46). In 2010, Greenberg was a candidate for the Republican nomination for Congress from Connecticut's Fifth Congressional District.

Counts Two through Seven related to Rowland's work for Wilson-Foley's 2012 campaign for the Republican nomination for Congress from Connecticut's Fifth Congressional District. The indictment alleged that consulting fees Rowland received from Apple were actually payments for campaign work, and that the fees were paid as part of a scheme to avoid disclosing Rowland's affiliation with the campaign in mandatory Federal Election Commission ("FEC") reports. The indictment charged Rowland with conspiracy, Section 1519, false statement, and illegal campaign contribution offenses arising from the payments. (A47-61).

## 2. The Draft Contract Rejected by Greenberg in 2009

Rowland and Greenberg first met in the summer of 2009. (A94). At their initial meeting, Greenberg told Rowland that he was interested in running for the United States Senate. (A95). Rowland told Greenberg that he should instead think about running for Congress. (*Id.*). After the meeting, Rowland discussed with Greenberg the possibility of working as a consultant for Greenberg's campaign.

6

(A96). Rowland and Greenberg also discussed Greenberg's charitable foundation—the Simon Foundation—which rescued unwanted dogs and cats. (A92-93, 107-08, 111). Rowland proposed to Greenberg that Rowland provide fundraising assistance to the Simon Foundation. (A100-01, 116).

In October 2009, Rowland and Greenberg met in person for the second time at the then-under-construction Simon Foundation facility. (A98, 112-13). At this meeting, Rowland handed Greenberg a draft contract proposal, which appeared to have been "cut and paste" from prior contracts. (A102-03, 119, 126, 554-55). The draft contract was between Rowland's consulting company and Greenberg personally. (A554). The draft contract stated, among other things, that Rowland's company "agrees to perform such consulting services . . . for Mark Greenberg, as may be reasonably requested by him with respect to . . . strategic advice, public relations, . . . or such other services as may be required." (*Id.*). The draft contract further stated that Rowland's company "also agrees to these same services for 'The Simon Foundation', but also including fund raising." (*Id.*). The broad language in the draft contract encompassed political consulting services. (*See, e.g.*, A114-15).

Greenberg immediately rejected the draft contract; he ripped it up and threw it out the day Rowland presented it to him. (A118, 124). Nevertheless, over the next nine months, Greenberg and Rowland periodically discussed the possibility of Rowland working on behalf of Greenberg's campaign. (A104, 106). Greenberg

7

testified that Rowland had said that he did not want to be paid by the campaign, and instead wanted to be paid by "other entities, perhaps the Simon Foundation, perhaps other real estate entities." (A97). Greenberg never hired Rowland in any capacity. (A123).

### 3. Rowland's Work for Wilson-Foley's Campaigns and Foley's Offer of a Position at Apple

Wilson-Foley was a Connecticut businesswoman who ran for lieutenant governor in 2010 and then ran for Congress in 2012. (A152-53). Rowland was an unpaid advisor to both campaigns. (A154-57). Even before Rowland began to work as a paid consultant for Apple, he was the "main advisor" to Wilson-Foley's congressional campaign. (A157). Rowland was a "sincere supporter" of Wilson-Foley and provided her with "top to bottom advice." (A211).

Wilson-Foley's husband, Brian Foley, was the owner and president of Apple. Apple was a substantial company. It operated 26 nursing homes in Connecticut and Rhode Island, employed approximately 3,000 to 3,500 people, and had annual revenues of approximately $200 million. (A150-51, 273).

On September 12, 2011, Rowland met with Wilson-Foley and her husband and sought to become a paid consultant to Wilson-Foley's 2012 congressional campaign. (A158-60). After this meeting, Wilson-Foley and her husband discussed the positives and negatives of the campaign hiring Rowland. (A164). They were concerned that Rowland's prior felony conviction and controversial status would

8

hurt the campaign. (A164, 166-67). After Wilson-Foley consulted with others, she concluded that the campaign should not hire Rowland. (A170-71).

The next morning, Foley decided to offer Rowland a consulting job at Apple. (A171). Foley felt that if he offered Rowland a job at Apple, Rowland would continue to be supportive of Wilson-Foley's congressional campaign. (*Id.*). Foley also believed that hiring Rowland had potential value to Apple. (A222). That morning, Foley told Wilson-Foley that he "may be able to hire Rowland for some work at Apple," and he asked Wilson-Foley to have Rowland give him a call. (A173).

Later that day, Rowland sent Foley an email stating in part as follows: "Brian, had a brief chat with Lisa, I get it, let's you and I meet, good time for you?" (A174, 506). Foley did not know what Wilson-Foley had said to Rowland to prompt this email. (A215).

Foley met with Rowland on September 16, 2011. (A178-79). At the meeting, Foley said he could hire Rowland for a consulting job at Apple, and Foley described in "great detail" what the job would entail. (A181). During the meeting, Foley identified areas, including lobbying and union negotiations, on which Rowland's expertise and experience would benefit Apple. (A182-84). Rowland "immediately engaged" with Foley on these issues and told Foley "how he thought

9

he could be helpful." (A219). Foley and Rowland met for approximately 30 minutes total, and they spent 27 minutes discussing Apple issues. (A179, 218).

Foley never told Rowland or anyone else that Rowland's job at Apple was a sham or that Rowland was being paid for campaign work. (A219). In addition, Foley consulted with a campaign finance law expert at the Patton Boggs law firm. (A187). The Patton Boggs lawyer advised Foley that it was legal for Apple to hire Rowland while Rowland worked as a volunteer for Wilson-Foley's campaign. (A187-88, 229-30).

### 4. Rowland's Contract for His Work at Apple

Apple general counsel Christian Shelton prepared a contract for Rowland's consulting work. (A192-94). Shelton recommended that the contract be between Shelton's law firm and Rowland "due to me [*sic*] Rowland's background and the compliance issue that creates and links to Lisa[']s campaign." (A192-93, 560). Foley agreed. (*Id.*). Although Rowland was not involved in this decision, he was sensitive to Foley's concern that a direct affiliation between Apple and Rowland, a former Republican governor, could negatively impact Apple's relationship with the administration of Connecticut's Democratic Governor. (A225-29).

Foley also decided that Rowland would be paid by one of Foley's realty companies, rather than by Apple. (A194). There was no evidence, however, that Rowland knew of this; he received payments from Shelton. (A251).

10

Rowland received a draft contract sometime prior to October 27, 2011. (*See* A563-65). Rowland signed the final version of the contract on November 11, 2011. (A549-53).

### 5.    Rowland's Work at Apple

After meeting with Foley in September, Rowland began to perform consulting services for Apple. Rowland became the first member of an Apple advisory board, and he met with Apple staff on eight to ten occasions. (A274-77). In these meetings, Rowland discussed issues of significance to Apple, including nursing home closings, reimbursement, unions, and the potential for Apple to be tarnished by negative congressional campaign advertisements produced by Wilson-Foley's opponents. (A277-81).

As part of his consulting work, Rowland toured an Apple facility (A282-83); met with, recommended, and negotiated a contract for a new lobbyist (A232); worked with the lobbyist on behalf of Apple (A232-34); prepared an analysis of a report (referred to as the Mercer report) relating to nursing home demand in Connecticut (A300-01); advised Apple executives of potential impacts of the Wilson-Foley congressional campaign on Apple's business (A236-37, 296-97); suggested and assessed other potential outside advisors (A238-39); and advised Apple on union issues (A295). Rowland was paid a total of $35,000 for seven months' work during the Apple consulting relationship. (GX 5; A240).

11

Foley instructed Shelton and Apple Chief Operating Officer Brian Bedard that Rowland should not be paid unless Bedard was satisfied that Rowland actually did the work for which Apple had retained him. (A199-200, 231). Once Bedard confirmed that Rowland was working for Apple, Shelton paid Rowland $10,000 for the first two months' work. (A197, 231).

### 6. Rowland's Role in the Wilson-Foley Campaign

After Foley offered Rowland a consulting position at Apple, Rowland continued his efforts on behalf of Wilson-Foley's congressional campaign. Rowland openly assisted the campaign and made several public appearances that made plain his association with Wilson-Foley's campaign. (A241-44). Rowland provided strategic advice to help a campaign that was generally run by young staffers with little campaign experience. (*See*, *e.g.*, A253-54, 260, 264, 266-67). But Rowland worked on behalf of the campaign significantly less than the campaign's general consultant, Chris Healy, and far less than campaign staff. (A261-62). Staffers reported that Rowland came by campaign headquarters anywhere from one to three times per week, but sometimes not at all in a given week. (A261, 263).

### 7. Rowland Ends His Relationships with the Campaign and with Apple

In April 2012, a reporter asked the Wilson-Foley campaign whether Rowland was being paid by the campaign, by one of Wilson-Foley's businesses or

12

by one of Foley's businesses. (A257). Foley then advised Wilson-Foley's campaign manager to disclose the relationship between Apple and Rowland. (A258). After Rowland's relationship with Apple was disclosed, he ended his involvement in the campaign and his consulting work for Apple. (A240, 251, 259).

**B.    The Government Investigation and Foley's Cooperation**

After the Wilson-Foley campaign acknowledged that Rowland had a paid position at Apple, the Government began to investigate. (A245). Foley initially insisted to the Government (through his counsel) that Apple's relationship with Rowland was legitimate. (A202).

The Government then discovered that Foley had engaged in illegal conduit campaign contribution schemes, in which he evaded campaign contribution limits by reimbursing friends and family members (including his adult children) for their contributions to Wilson-Foley's campaign. (A203-10, 213-14, 248-49). As the Government acknowledged, Foley "only began to cooperate with the government after his sister and niece had testified in the grand jury and implicated him in [a] conduit [campaign] contribution scheme" that had nothing to do with Rowland. (Government Memorandum in Aid of Sentencing ("Gov't Sentencing Mem.") in *United States v. Brian Foley*, No. 3:14cr65 (JBA) [Dkt. 62-1], at 17).[1] Only then,

_____

[1] This Court may take judicial notice of the filings in Foley and Wilson-Foley's criminal cases. *See Hong Mai Sa v. Doe*, 406 F.3d 155, 158 (2d Cir. 2005) (noting

"[f]acing almost certain indictment and conviction, [did] Mr. Foley start[] cooperating with the government in the case against John Rowland." (*Id.*; *see* A246-49).

Foley testified pursuant to a remarkable deal with the Government. In exchange for his testimony against Rowland, the Government (1) agreed not to prosecute Foley for any of the numerous felonies he had committed and instead allowed Foley to plead guilty to a single misdemeanor, (2) agreed that Wilson-Foley could plead guilty to a single misdemeanor and (3) agreed not to prosecute Foley's friends and other family members for their participation in Foley's illegal conduit campaign contribution schemes. (A203-10, 250).

## C.    Pretrial Proceedings

The original indictment (which was largely identical to the superseding indictment) was filed on April 10, 2014. On May 20, 2014, Rowland moved to dismiss the indictment, arguing, among other things, (1) that the Section 1519 counts (Counts One and Three) should be dismissed, because neither the draft Greenberg contract nor the Shelton contract were falsified within the meaning of Section 1519, and (2) that the illegal campaign contribution counts (Counts Six and Seven) should be dismissed because individual campaign contribution limits are

that "we can take judicial notice of this Court's files as well as those of the district court").

14

unconstitutional. On July 8, 2014, the District Court denied the motion to dismiss. (SPA1-23).

### D. The Trial

At trial, the Government called three witnesses to testify about Rowland's proposal to work for Greenberg: Greenberg, Marc Katz (Greenberg's friend, business associate and campaign manager (A125, 141)), and Sam Fischer (a consultant to Greenberg's campaign (A129)). During Greenberg's testimony, he opined that payments to campaign consultants from anyone other than the campaign were "wrong" and would be "secret." (A105, 127-28). Greenberg was mistaken about the law, but the District Court refused to instruct the jury that, in fact, candidates may personally pay campaign staff, and such "in kind" campaign contributions must be reported to the FEC. (*See* A292, 335-37).

Over objection, the District Court permitted Fischer and Katz to testify that Greenberg had told them that Rowland had proposed to be paid for campaign work through the Simon Foundation. (A121-22, 130-31, 142-43). During Katz's testimony, the Court instructed the jury that the testimony was being received "for what Mr. Katz was told by Mr. Greenberg, not whether what he was told was, in fact, truthful or accurate." (A143). The Court also permitted Katz to testify over objection that Rowland's alleged proposal "didn't smell right." (A144-45).

15

With respect to the charges relating to the 2012 Wilson-Foley campaign, the Government's witnesses included Foley, campaign staffers, and Apple employees. Over objection, the District Court permitted Foley to opine about what Rowland meant when he wrote in email messages phrases such as "I get it" (A177), "this arrangement" (A195), "our agreement" (*id.*), and "cover" (A196). For example, Foley testified that when Rowland wrote, "Brian, had a brief chat with Lisa, I get it" (A556), Rowland meant that he understood that he would be "really working for the campaign." (A177).

In contrast to the District Court's liberal admission of hearsay and opinion testimony during the Government's case, the District Court barred Rowland from offering emails, text messages and other evidence of Rowland's work for Apple on the ground that it was inadmissible hearsay. The Government argued that Rowland should not be able to offer his own text messages in evidence without testifying. (A306-07). The Court agreed, first asking, "If the substance of the message is to show his state of mind, why is that not for the truth of the matter?" and then excluding the messages. (A306-09). As a result, the Court excluded on hearsay grounds (1) a text message exchange between Rowland and Apple Chief Operating Officer Bedard regarding union issues at Apple, in which Rowland asked, "was the contract signed yesterday? the union contract" (A305-09, 580); (2) an email exchange between Rowland and Bedard about unionization efforts (A284-89, 578);

and (3) testimony about Rowland's advice to Apple when Foley was soliciting campaign contributions from Apple employees (A302-04).

### E.    The Verdict and the Denial of Rowland's Rule 29 Motion

On September 19, 2014, the jury returned a verdict of guilty on all counts. (A442-43). The District Court orally denied Rowland's motion for a judgment of acquittal at the close of the Government's case (A271-72, 310). Rowland renewed his Rule 29 motion after trial; the District Court denied the motion in a written ruling. (SPA24-27).[2]

### F.    The Posttrial *Brady* Litigation

#### 1.    Wilson-Foley's Sentencing Memorandum Reveals Undisclosed Exculpatory Information

Over two months after Rowland's trial, Wilson-Foley's counsel filed a sentencing memorandum in her case, through which Rowland learned for the first time that Wilson-Foley had told the Government that, at the time she conveyed Foley's job offer to Rowland, she believed Foley was hiring Rowland for real work at Apple. (*See* Memorandum in Aid of Sentencing on behalf of Lisa Wilson-Foley [Dkt. 51], in *United States v. Lisa Wilson-Foley*, No 3:14cr65 (JBA), at 4 (stating that Wilson-Foley "is staying true to what she has told the Government from the

---

[2] The District Court's ruling mistakenly states that Rowland did not identify any factual or legal basis for the relief sought. (SPA25). In fact, Rowland's memorandum of law in support of his motion incorporated the arguments set forth in his pretrial motion to dismiss. (*See* Memorandum in Support of Motion for Acquittal [Dkt. 189], at 4).

time of her first interview well before her guilty plea—that she believed in September 2011 that the Foley/Rowland relationship involved real work for Apple")).

The Government's sentencing memorandum, which was filed the same day, confirmed that Wilson-Foley had provided the Government with information at odds with its theory of the case. The Government wrote that Wilson-Foley "*continues* to suggest, despite all the evidence, that she initially believed her husband's arrangement with Mr. Rowland was legitimate" and that "the Government did not enter a cooperation agreement with Ms. Wilson-Foley or call her as a trial witness because of her inability to candidly and unequivocally acknowledge the scope of her conduct." (*See* Government's Memorandum in Aid of Sentencing [Dkt. 61] in *United States v. Lisa Wilson-Foley*, No 3:14cr65 (JBA), at 7, 9 (emphasis added)).

The Government never disclosed that Wilson-Foley had insisted to the Government that she believed Rowland was being hired for a real job at Apple. Wilson-Foley's exculpatory statements were omitted from a memorandum of interview that the Government had produced to Rowland. (A456-58). Wilson-Foley's undisclosed statements directly contradicted the Government's theory at trial that Rowland, Wilson-Foley and Foley all believed from the start that Rowland's job at Apple was a sham. (*See, e.g.*, A90).

18

## 2. The Affidavit from Wilson-Foley's Counsel and the Government's Submission

Rowland advised the District Court of the Government's apparent failure to disclose exculpatory information as required by *Brady v. Maryland* and its progeny and requested an evidentiary hearing. The Court then directed Wilson-Foley's attorney to submit an affidavit explaining the basis for his statements in the sentencing memorandum. Wilson-Foley's attorney submitted an affidavit, which reported, among other things, the following:

> • During Wilson-Foley's March 10, 2014 interview with the Government, she stated that she "believed that Mr. Rowland could provide real and valuable services to Apple based on his experience and contacts."
>
> • During "breaks" in the interview, which were not memorialized, the Government advised Wilson-Foley that "the Government believed the Rowland/Apple relationship was entirely a 'sham' and she should acknowledge as much."
>
> • In response, Wilson-Foley stated that "when Mr. Foley had suggested that he had a job for Mr. Rowland, she believed it would be a real job, not a 'sham.'" Wilson-Foley "refused to adopt the Government's view that the Rowland/Apple relationship was a 'sham.'"
>
> • During conversations with the prosecutors, Wilson-Foley's counsel stated that Wilson-Foley "reasonably believed, based on her conversations with her husband between September 2011 and April 2012, that Mr. Rowland was going to and did perform services on a number of issues as a 'consultant' to Apple."

(A445-48).

19

The Government opposed Rowland's request for an evidentiary hearing. The Government argued that Wilson-Foley's statements to the Government were not suppressed, because Rowland knew that, during the alleged conspiracy and prior to the Government's investigation, Wilson-Foley had told her campaign staff and the public that Rowland was performing work at Apple. (*See* Government's Memorandum in Opposition to Defendant's Post-Trial Request for Evidentiary Hearing [Dkt. 210], at 18-19, 24-26). The Government also noted that it had produced to Rowland a voicemail message to the Government from an attorney who was then representing both Foley and Wilson-Foley. The voicemail message stated in part as follows:

> [Foley] kept his wife in the dark relative to the deal with Rowland and he also kept –uh—Bernard [sic] [Brian Bedard] in the dark, along with the other guy at the company, and so when she said that she really didn't know that this was a deal -- uh-- for Rowland to work on the campaign—um—it's consistent what he said to her. Now, later on when she got that email there may have been something that should've popped into her head … But --- err--- So, I think people are overreacting to this thing about her -- uh -- lying or mis-forgetting [sic] or what have you.

(*Id.* at 14).

The Government also argued that Wilson-Foley's statements to the Government were not material. (*Id.* at 27-54).

20

### 3.     The District Court Denies an Evidentiary Hearing

The District Court denied Rowland's request for an evidentiary hearing. (SPA28-41). The Court ruled that Wilson-Foley's statements were not exculpatory because Wilson-Foley had said that "one purpose" of hiring Rowland at Apple was to help the campaign. (SPA35). The Court also ruled that Rowland somehow knew the "essential facts" of Wilson-Foley's statements to the Government through Wilson-Foley's pre-investigation statements to campaign staff and the public and through her lawyer's voicemail message. (SPA35-36). The Court ruled that Rowland suffered no prejudice because he "has not shown that the purportedly non-disclosed statements were not otherwise made known to him" and because Rowland could have used other evidence, including the attorney voicemail, to impeach Foley. (SPA39).

### 4.     Rowland's New Trial Motion

Rowland then filed a motion for reconsideration or for a new trial. Rowland included in the motion additional evidence obtained from another attorney who initially had represented both Foley and Wilson-Foley and had attended Wilson-Foley's meeting with the Government. This evidence included the attorney's notes of Wilson-Foley's meeting with the Government, which revealed the following:

> •      One of the prosecutors told Wilson-Foley during the meeting that "the next few minutes are very important for you; it is not credible to us that you didn't know that the Apple job was a sham."

21

- Wilson-Foley told the prosecutors that "it didn't ring out to her that Brian hired him as a sham; she didn't know this at the time."

(A513). In addition, the attorney's notes revealed that, the day after the prosecutors interviewed Wilson-Foley, the prosecutors told her attorney (1) that in light of Wilson-Foley's purportedly untruthful statements, the Government was revoking its misdemeanor plea offer to Foley, and (2) "it doesn't matter what [Wilson-Foley] is willing to say today; she did too much damage yesterday." (A514). The prosecutors also said they "would not meet with Ms. Wilson-Foley again unless she was willing to state that she knew the contract was a sham from the start." (A515).

### 5. The District Court Denies Relief

The District Court denied Rowland's motion for reconsideration or a new trial. (SPA42-53). The Court ruled that "*Brady* is not intended to eliminate the litigation risks associated with calling a witness whose testimony is uncertain." (SPA45). The Court reiterated its view that Wilson-Foley's statements to the Government were "cumulative" and that Rowland "had sufficient information available to him to elicit testimony from Ms. Wilson-Foley that she believed that Mr. Rowland provided some legitimate work to Apple." (SPA46, 51). The Court also ruled that Rowland had failed to establish prejudice. (SPA47-49).

### G. Sentencing and the Granting of Bail Pending Appeal

At sentencing, the District Court determined that the applicable Sentencing Guideline was U.S.S.G. § 2C1.8. (A537). In calculating the Guidelines offense level, the Court ruled that the value of the illegal campaign contribution was $35,000 (the total amount received by Rowland), even though it assumed (based on Foley's prior statements to the Government) that Foley believed Rowland's services were worth $5,000 to Apple. (A515, 534, 536-37). The Court then determined that the Guidelines sentencing range was 24 to 30 months' imprisonment and imposed an aggregate sentence of 30 months' imprisonment. (A537, 543).

On May 21, 2015, the District Court granted Rowland bail pending appeal. (A39).

### SUMMARY OF ARGUMENT

The Government charged in Count One that Rowland "falsified" a document in violation of Section 1519 by drafting a contract proposal that did not contain an explicit reference to campaign work. But, as the Supreme Court recently emphasized, Section 1519 must be construed narrowly in light of the statute's purpose—"to prohibit, in particular, corporate document-shredding to hide evidence of financial wrongdoing." *Yates v. United States*, 135 S. Ct. 1074, 1081 (2015) (plurality opinion). No contract, let alone a draft contract proposal that was

23

immediately rejected, can constitute the sort of "falsified" document criminalized by Section 1519. That same logic applies equally to Count Three, which also charged Rowland under Section 1519. Accordingly, Rowland's Section 1519 convictions cannot stand.

The Government pursued unfounded Section 1519 charges so it could offer in evidence otherwise inadmissible testimony from Greenberg and his confederates. The Government needed this evidence to bolster Foley's testimony and the other evidence offered in support of the remaining charges related to the Wilson-Foley campaign. The Government itself admitted that the Greenberg-related evidence was "one of the most important aspects of the Government's evidence concerning Mr. Rowland's criminal conduct in connection with the Wilson-Foley campaign." In light of the spillover prejudice from the Section 1519 evidence, the jury's verdict on Wilson-Foley-related charges cannot stand.

The jury's verdict was also tainted by the Government's failure to disclose exculpatory evidence, as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The Government failed to disclose that, even in the months leading up to trial, Wilson-Foley continued to refute the Government's theory of the case. Unbeknownst to Rowland, Wilson-Foley told the Government that, at the time she conveyed her husband's job offer to Rowland, she believed Rowland was being hired for "a real job, not a 'sham.'" Wilson-Foley would not waver from her

24

account, even after the Government repeatedly pressed her to change her story and threatened to rescind her husband's misdemeanor plea offer. Contrary to the District Court's rulings, Wilson-Foley's public statements during the alleged conspiracy are no substitute for her statements to the Government during its investigation. Had Rowland known of Wilson Foley's powerful exculpatory statements and of the Government's coercive effort to have Wilson-Foley change her account, there is a reasonable probability that the outcome of the trial would have been different. Accordingly, the jury's verdict cannot stand.

Flaws in the District Court's jury instructions also affected the verdict. The District Court erroneously changed Rowland's theory of the defense instruction to eliminate his state of mind defense. As a result, the jury could have convicted Rowland even if it concluded that he believed he was being paid for his work at Apple. The Court also wrongly declined to instruct the jury on relevant provisions of campaign finance law. This allowed the jury to credit Greenberg's legally incorrect testimony regarding a candidate's supposed inability to pay campaign workers with personal funds, as well as the reporting obligations that would result from such payments. Further, the Court wrongly instructed the jury that the omission of any fact that would be of interest to any Government agency renders a document "falsified" for purposes of Section 1519. This expansive omission theory

is legally unsound, as it would mean that, under Section 1519, every document is a "falsified" document. These instructional errors prejudiced Rowland's defense.

In addition, the District Court's erroneous and one-sided evidentiary rulings caused prejudice. The Court wrongly excluded on hearsay grounds emails and other evidence showing that Rowland believed he was being paid to work for, and did in fact work for Apple. In contrast, the District Court erroneously allowed the Government to offer hearsay testimony from Greenberg's confederates regarding what Greenberg had said to them. The District Court also erroneously permitted Government witnesses to opine about the purported meaning of Rowland's emails and the propriety of Rowland's actions. The District Court's asymmetrical interpretation of the rules of evidence deprived Rowland of a fair trial.

Finally, the District Court erred at sentencing. It calculated the Guidelines range by using the full amount of Rowland's consulting payments ($35,000), even though Foley had told the Government that Rowland provided at least $5,000 worth of services to Apple, and the Court directed the parties to assume Foley believed that was the case. Had the Court correctly deducted the minimum value of Rowland's Apple work ($5,000), the Guidelines range would have been lower. The sentence, like the conviction, cannot stand.

**STANDARDS OF REVIEW**

This Court reviews the sufficiency of the evidence *de novo*, determining whether a rational jury could find the essential elements of the crime beyond a reasonable doubt. *See United States v. Novak*, 443 F.3d 150, 157 (2d Cir. 2006). The Court also reviews *de novo* a district court's rulings concerning jury instructions. *See United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013). This Court reviews a district court's evidentiary rulings for an abuse of discretion; under that standard, the Court conducts *de novo* review of any underlying legal conclusions, such as whether a statement is hearsay. *See id.* at 82; *United States v. Ferguson*, 676 F.3d 260, 285 (2d Cir. 2011).

This Court reviews the denial of a motion for new trial based on an alleged *Brady* violation for an abuse of discretion. *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008). "When reviewing alleged *Brady* violations, [this Court] examine[s] the record *de novo* to determine where the information in question is material as a matter of law." *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012).

In reviewing sentences, this Court reviews issues of law *de novo* and factual findings for clear error. *United States v. Kleiner*, 765 F.3d 155, 158 (2d Cir. 2014).

## ARGUMENT

**I.     The Conviction Should be Reversed Because Rowland Did Not Violate Section 1519**

**A.     The Section 1519 Charges**

Counts One and Three charged Rowland with violating Section 1519, which

provides in pertinent part as follows:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . , or in relation to or contemplation of any such matter or case [is guilty of a crime].

18 U.S.C. § 1519. Count One alleged that Rowland violated Section 1519 by

drafting the proposed contract between his consulting company and Greenberg—a

draft contract that Greenberg immediately rejected. Count One alleged that

Rowland "falsified and made material false entries in" the draft contract. (A46).

Count Three alleged that Rowland "falsified and made material false entries in" his

contract with Apple attorney Shelton. (A59).

**B.     The Government Did Not Prove that Rowland Violated Section 1519**

The convictions on Counts One and Three cannot stand, because neither the

draft contract rejected by Greenberg nor Rowland's contract with Apple attorney

Shelton were "falsified" documents or documents with "false entries," as those

terms are used in Section 1519.

28

First, one cannot make a "false entry" in a contract. Contracts are agreements between parties and not recordkeeping devices in which "entries" are made. *See*, *e.g.*, *Yates*, 135 S. Ct. at 1090 (Alito, J., concurring) (noting that the phrase "'makes a false entry in' . . . makes no sense outside of filekeeping").

Second, a contract is "falsified" only if it (1) represents a forgery or alteration of a preexisting contract, or (2) contains misrepresentations of historical fact (*i.e.*, it falsely describes events that occurred before the contract was signed). *See United States v. Blankenship*, 382 F.3d 1110, 1132-33 (11th Cir. 2004). Indeed, "a contract is not a factual assertion, and therefore cannot be characterized as 'true' or 'false.'" *Id.* at 1135. For example, in *Blankenship*, the defendants were engaged in an affirmative action fraud scheme. *Id.* at 1116-17. In furtherance of the scheme, a minority-owned business entered into equipment leases and subcontracts with another company. *Id.* at 1132. Even though neither party intended to perform their obligations under the equipment leases and subcontracts, and even though the parties entered into those contracts "with an intent to mislead," the Eleventh Circuit held that the contracts could not be deemed "false." *Id.* at 1134. The Court explained that a contract "*does not* state or imply that either party will actually enforce its contractual obligations." *Id.* (emphasis in original). Accordingly, "though the contracts in one sense may be 'shams,' in that neither party ever

29

intended to enforce their contractual rights, this does not render the contract 'false.'" *Id.*

Neither the draft contract rejected by Greenberg nor Rowland's contract with Apple attorney Shelton were forgeries, and neither document contained any misrepresentations of historical fact. Accordingly, these documents were not "falsified" within the meaning of Section 1519.

### 1. The Draft Contract Rejected by Greenberg Was Not "Falsified"

The draft contract at issue in Count One was an initial proposal that Rowland delivered to Greenberg at their second meeting, and which Greenberg immediately rejected. (A96, 99, 118, 124). The contracting parties in the draft were Rowland's consulting company and Greenberg personally. The draft contract stated, among other things, that Rowland's company "agrees to perform such consulting services . . . for Mark Greenberg, as may be reasonably requested by him with respect to . . . strategic advice, public relations, . . . or such other services as may be required." (A574). This broad language encompassed political consulting services. (*See*, *e.g.*, A114-15). The draft contract further stated that Rowland's company "also agrees to these same services for 'The Simon Foundation', but also including fund raising." (A574). Before presenting the draft contract to Greenberg, Rowland had specifically proposed that he provide

30

fundraising assistance to the Simon Foundation, which was Greenberg's charitable animal rescue and adoption center. (A92-93, 116).

This unexecuted draft contract does not contain "false entries"; indeed, it does not contain any entries at all. As discussed above, a contract is not a recordkeeping device that is capable of containing "false entries."

Further, because Greenberg rejected the draft contract, it could not possibly have been a "falsified" document (*i.e.*, an altered version of an actual contract between Rowland and Greenberg). In any event, the draft contract was not altered, and it contains no false statements of historical fact.

Notably, the indictment incorrectly alleged that the draft contract "purport[ed] to establish a paid consulting relationship between ROWLAND and the [Simon Foundation]." (A45 ¶ 19). In fact, the draft contract proposed a relationship with Greenberg personally. As discussed in more detail below, campaign finance laws permit a candidate to personally pay campaign consultants. *See* 11 C.F.R. §§ 100.52(d)(1), 100.111(e)(1), 104.13, 110.10.

Perhaps recognizing this deficiency, at trial, the Government's theory was that the draft contract was "falsified" because it omitted an express reference to campaign services, and that reference would have been material to the FEC or the Department of Justice. (*See*, *e.g.*, A427 ("But there's not a single word about the campaign in this contract; not a single word. And Judge Arterton instructed you

31

that a document can be false both by an affirmative false statement and an omission.")). This omission theory, on which the jury was instructed over Rowland's objection (A340-42, 375, 424-25, 440), is legally unsound. Under the Government's theory, anyone who plans to evade any governmental requirement (*e.g.*, a backpacker who plans to camp in a national park without a required permit) would have an affirmative obligation to mention the planned evasion in all related contracts and other documents, lest they be subject to 20 years' imprisonment. Congress could not have possibly intended for Section 1519—a statute enacted in the wake of the Enron scandal to prohibit "corporate document-shredding to hide evidence of financial wrongdoing," *Yates*, 135 S. Ct. at 1081—to create an affirmative obligation to include all information of interest to any governmental agency in any document prepared in the course of business or personal affairs.

In the District Court, the Government cited Black's Law Dictionary for the proposition that "falsify" means "to make deceptive" and then argued that any deceptive document is "falsified." (*See*, *e.g.*, Government's Opposition to the Defendant's Motion for Continued Release Pending Appeal [Dkt. 250], at 3). This argument suffers from at least two flaws. First, even the dictionary cited by the Government states that "falsify" *especially* refers to tampering with preexisting documents. *See* Black's Law Dictionary 720 (10th ed. 2014) (defining "falsify" as "[t]o make deceptive; to counterfeit, forge, or misrepresent; *esp., to tamper with (a*

32

document, record, etc.) by interlineation, obliteration or some other means*"*
(emphasis added)). This supports the view that, under Section 1519, documents are
"falsified" through forgery or alteration, and not simply by omitting information
that would be of interest to a Government agency.

Second, in rejecting the Government's argument that a fish was a "tangible
object" under Section 1519, the Supreme Court recently held that the statute cannot
be interpreted simply by referring to dictionary definitions. *See Yates*, 135 S. Ct. at
1082 ("[A]lthough dictionary definitions of the words 'tangible' and 'object" bear
consideration, they are not dispositive of the meaning of 'tangible object' in
§ 1519."). Rather, Section 1519 must be interpreted in light of various principles,
including its placement within Title 18, through which Congress "ranked § 1519,
not among the broad proscriptions, but together with specialized provisions
expressly aimed at corporate fraud and financial audits." *Yates*, 135 S. Ct. at 1084.
In addition, Section 1519 is interpreted in light of the "principle of *noscitur a
sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word
a meaning so broad that it is inconsistent with its accompanying words, thus giving
unintended breadth to the Acts of Congress.'" *Id.* at 1085 (quoting *Gustafson v.
Alloyd Co.*, 513 U.S. 561, 575 (1995)). In Section 1519, the words "falsifies, or
makes a false entry in" follow "alters, destroys, mutilates, conceals, covers up"—
actions that all relate to the destruction or concealment of information found in

33

preexisting documents. These interpretive principles should lead this Court to reject the Government's expansive view that Section 1519, *sub silentio*, created an new affirmative obligation to include in contracts, drafts, agendas and other documents all information of interest to any Governmental agency.

In fact, if Section 1519 were read to prohibit anyone from drafting a contract or other document that omitted a fact that would be material to any governmental agency, the statute would be unconstitutionally vague. *See, e.g.*, *Johnson v. United States*, 135 S. Ct. 2551, 2556-57 (2015); *Kolender v. Lawson*, 461 U.S. 352, 361 (1983) (holding that, to comport with due process, a statute must "describe with sufficient particularity what a suspect must do in order to satisfy" it). Moreover, the rule of lenity, which the *Yates* plurality applied to interpret Section 1519, *see* 135 S. Ct. at 1088, reinforces the notion that Section 1519 should not be read (1) to create an affirmative obligation to include facts in contracts or (2) to prohibit the drafting of any contract proposal that is immediately rejected.

In the District Court, the Government sought to make much of the fact that during the Government's investigation in 2013, Rowland's attorney provided the draft contract to the Government and noted that the contract proposal did not mention the campaign. (A576-77). At that time, Rowland's attorney was seeking, among other things, to correct the Government's misimpression (based on information provided by Greenberg) that Rowland had presented the contract

34

proposal in March 2010, rather than October 2009. (*See* A269-70). In any event, the arguments of Rowland's counsel in 2013 have no relevance to the question of whether Rowland "falsified" the contract when he prepared it in 2009.

In sum, the draft contract rejected by Greenberg was not a falsified document or a document containing false entries within the meaning of Section 1519, and the conviction on Count One cannot stand.

### 2.    The Contract with Shelton Was Not "Falsified"

The evidence offered by the Government on Count Three, which charged that Rowland "falsified and made material false entries in" his contract with Apple attorney Shelton, was also legally insufficient. The contract (A549-53) contains no false entries, was not altered, and did not contain false statements of historical fact. Moreover, before signing the contract, Rowland suggested changes in the contract language. (A223-25, 563-65). This demonstrated that Rowland understood that the contract was an actual, enforceable document that would govern his consulting relationship. Accordingly, a rational juror could not have concluded that Rowland's contract with Shelton was a "falsified" document or a document with "false entries." *See United States v. Blankenship*, 382 F.3d at 1133.

### C.    The Jury's Verdict on All Counts Should Be Vacated Because of Prejudicial Spillover

When a conviction on one count is reversed for legal insufficiency, a new trial is required on the remaining counts "where there is prejudicial spillover from

evidence used to obtain a conviction subsequently reversed on appeal." *United States v. Hamilton*, 334 F.3d 170, 181-83 (2d Cir. 2003) (internal quotations omitted); *see, e.g.*, *United States v. Bruno*, 383 F.3d 65, 91 (2d Cir. 2004). As set forth above, there was insufficient evidence to support the jury's verdict on Count One (the only Count relating to Rowland's proposal to Greenberg). Indeed, the District Court erred in not dismissing Count One before trial. The otherwise inadmissible Count One evidence—testimony from Greenberg, Fischer and Katz—prejudiced Rowland's defense on Counts Two through Seven (the counts relating to the Wilson-Foley campaign). Accordingly, the convictions on these counts cannot stand.

Importantly, the Government acknowledged that the evidence offered in connection with Count One was "one of the most important aspects of the Government's evidence concerning Mr. Rowland's criminal conduct in connection with the Wilson-Foley campaign." (Gov't Mem. in Opposition to Defendant's Post-Trial Request for Evidentiary Hearing [Dkt. 210], at 52). Indeed, the Government needed the Count One evidence to bolster Foley's testimony, given Foley's strong incentive to falsely implicate Rowland in wrongdoing.

Foley was the Government's chief witness on Counts Two through Seven, and the Government acknowledged that "Foley's cooperation and trial testimony were instrumental." (Gov't Sentencing Mem. in *United States v. Brian Foley*, No.

36

3:14cr65 (JBA) [Dkt. 62-1], at 13). Foley, however, only "started cooperating with the government in the case against John Rowland" when he was "[f]acing almost certain indictment and conviction" for conduit contribution schemes that had nothing to do with Rowland. (*Id.* at 17). It is hardly surprising that Foley changed his story to suit the Government in light of the Government's highly favorable misdemeanor plea offer, which allowed Foley to avoid an "almost certain" felony conviction and protected Foley's friends and family members from prosecution. (*See* A203-10, 250).

Under these circumstances, the evidence offered in connection with Count One, including Greenberg, Fischer and Katz's testimony, created spillover prejudice with respect to Counts Two through Seven. The Government admittedly bolstered Foley's trial testimony with the Count One evidence, and the resulting prejudicial spillover requires a new trial on the remaining counts of conviction.

Testimony from Greenberg, Fischer and Katz would not have been admissible if Count One had not been included in the indictment. Rowland's alleged efforts to work for Greenberg in 2009 and 2010 had no relevance to the charges relating to the 2012 Wilson-Foley congressional campaign. The two alleged schemes differed in a critical respect: there is no allegation that Rowland suggested that he be paid for work on the Wilson-Foley campaign through a third party. To the contrary, it is undisputed (1) that Foley came up with the idea of

37

hiring Rowland to work at Apple (2) that Rowland *never* suggested that Foley or Wilson-Foley pay him for campaign work through a third party, and (3) that Foley never told Rowland or anyone else that Rowland's job at Apple was a sham or that he was being paid for campaign work. (A219-20). Yet the Government used testimony from Greenberg, Fischer and Katz to cast Rowland as a person of bad character who did things that "didn't smell right" and who repeatedly sought money from political novices. (*See*, *e.g.*, A145, 428, 430). This prejudiced Rowland's defense on the counts relating to the Wilson-Foley campaign.

Notably, the Government used the Greenberg-related evidence for the very purpose prohibited by Federal Rule of Evidence 404(b): "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). For example, the Government argued in its summation that Rowland repeatedly targeted rich political novices (A428 ("Mr. Greenberg didn't have any political experience. He was a novice. . . . What's the one thing Mr. Greenberg did have? Money, and a lot of it. And so that's what Mr. Rowland's proposing here, is to get paid $35,000 a month."), A430 ("Sure, she's run one time before, but she's not an experienced politician. Like Mr. Greenberg, worth an awful lot of money.")). In addition, the Government elicited testimony from Greenberg and his confederates that they

38

believed Rowland's alleged proposal was "wrong," "illegal" and "didn't smell right." (A105, 133-34, 144-45).

In sum, the Government rightly acknowledged that the Greenberg-related evidence was "one of the most important aspects of the Government's evidence" on Counts Two through Seven. Because there was insufficient evidence to support the jury's verdict on the Greenberg-related count, and because the Greenberg-related evidence would not have been otherwise admissible, this Court should vacate the convictions on Counts Two through Seven.

## II. The Conviction Should Be Vacated Because of the Government's *Brady* Violation

The Government's violation of its disclosure obligations under *Brady v. Maryland* and its progeny requires a new trial. There is no dispute that the Government never disclosed to Rowland that, during a March 10, 2014 interview, Wilson-Foley told the Government that, at the time Rowland was hired to work at Apple, she believed he was being hired for "a real job, not a 'sham.'" (A446). There is also no dispute that the Government failed to disclose that Wilson-Foley would not waver from her account, even after the Government repeatedly pressed her to change her story and threatened to rescind her husband's misdemeanor plea offer. (A446, 513-15). Wilson-Foley's statements to the Government were highly exculpatory, as they directly contradicted the Government's theory at trial that Rowland, Wilson-Foley and Foley all believed from the start that Rowland's job at

39

Apple was a sham. (*See, e.g.*, A90). If Rowland had known before trial that Wilson-Foley refused to adopt the Government's version of events even in the face of Government threats, there is a reasonable probability that the result of the proceedings would have been different.

In rejecting Rowland's motion for a new trial, the District Court made critical legal errors. For example, the District Court wrongly ruled that the Government has no obligation under *Brady* to disclose information in its possession that would "eliminate the litigation risks associated with calling a witness whose testimony is uncertain" to the defendant. (SPA45). In fact, the, Government is obliged to produce such information. *See*, *e.g.*, *United States v. Mahaffy*, 693 F.3d at 131. Likewise, the District Court did not properly assess the exculpatory nature of Wilson-Foley's statements, because the Court did not recognize that it is lawful to hire an individual for a real job with the hope that the individual would then volunteer for a campaign. Applying the proper legal principles, Wilson-Foley's statements to the Government were both suppressed and materially exculpatory. Accordingly, the Government violated its *Brady* obligations, and Rowland is entitled to a new trial.

## A. The Government's *Brady* Obligations

"*Brady* requires that the government disclose material evidence favorable to a criminal defendant." *Mahaffy*, 693 F.3d at 127. "Evidence is favorable if it is

40

either exculpatory or impeaching, *Strickler v. Greene*, 527 U.S. 263, 281-82 . . . (1999), and it is material if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Mahaffy*, 693 F.3d at 127 (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006)). "'[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,' but rather, a conviction must be reversed 'upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Youngblood*, 547 U.S. at 870). The Government's obligation to disclose exculpatory information extends to statements by an individual's attorney. *See United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 165 (2d Cir. 2008). A new trial is required when the Government suppresses material exculpatory evidence, regardless of whether the suppression was willful or inadvertent. *See United States v. Douglas*, 525 F.3d at 245.

A defendant has no obligation "to exercise due diligence to obtain *Brady* material." *Lewis v. Connecticut Commissioner of Corrections*, 790 F.3d 109, 121 (2d Cir. 2015). Accordingly, a defendant "who was reasonably unaware of exculpatory information" need not "take affirmative steps to seek out and uncover

41

such information in the possession of the prosecution in order to prevail under *Brady*." *Id*.

**B.     The Government Violated Its *Brady* Obligations by Failing to Disclose Wilson-Foley's Statements**

The Government violated its *Brady* obligations by failing to disclose that Wilson-Foley refused to adopt the Government's theory of the case, *i.e.*, that Foley, Wilson-Foley and Rowland entered into a criminal conspiracy on the day that (1) Wilson-Foley told Rowland about Foley's job offer and (2) Rowland responded by sending an email to Foley stating, "I get it" (A556). The District Court committed legal error in ruling that these statements were not suppressed and did not comprise material exculpatory information.

**1.     Wilson-Foley's Statements to the Government Were Suppressed**

It is undisputed that the Government never disclosed (1) that Wilson-Foley told the Government that, at the time Rowland was hired to work at Apple, she believed he was being hired for "a real job, not a 'sham'" and (2) that Wilson-Foley would not waver from her account, even after the Government repeatedly pressed her to change her story and threatened to rescind her husband's misdemeanor plea offer.

The District Court committed legal error in ruling that the Government had no obligation to disclose this information on the ground that Rowland "had

42

sufficient information available to him to elicit testimony from Ms. Wilson-Foley that she believed that Mr. Rowland provided some legitimate work to Apple." (SPA46). The only evidence that the Court identified as being available to Rowland was (1) a cryptic and context-free voicemail message from a lawyer then representing both Wilson-Foley and her husband; (2) Wilson-Foley's statement during her guilty plea allocution that "I should have put some of the money that my husband paid to John Rowland towards a record of that for my campaign"; and (3) Wilson-Foley's public statements and statements to campaign workers in 2011 and 2012 that Rowland was doing real work at Apple. (SPA45-46). Rowland could not have known from any of this evidence that Wilson-Foley, unlike her husband, had refused to change her account and adopt the Government's version of events. This is particularly true because the Government represented during trial that it was "still not certain whether Ms. Lisa Wilson-Foley will or will not take the stand" (A162-63), thereby suggesting that Wilson-Foley had adopted the Government's theory of the case.

Moreover, when Wilson-Foley spoke to the Government, she was obliged to tell the truth, lest she be subject to a false statement prosecution. *See* 18 U.S.C. § 1001. As a result, Wilson-Foley's statements to the Government in 2014 (unlike her statements to campaign workers and the public in 2011 and 2012 or her attorney's voicemail message) would have been "an effective tool in disciplining

43

[her] during cross-examination." *Mahaffy*, 693 F.3d at 131 (internal quotations omitted). Such impeachment material must be disclosed under *Brady* and its progeny. *Id.*

For example, in *Mahaffy*, this Court reversed a trial conviction because the Government failed to disclose SEC deposition testimony that contradicted the Government's theory of the case. 693 F.3d at 134. This Court rejected the Government's argument that it was sufficient that the defendant knew other information about the individuals who had testified in the SEC matter. *Id.* at 131 ("Whatever [the defendant] knew, he did not know what Romero told the SEC under oath."). This Court ruled that the Government was obligated under *Brady* to produce the sworn SEC testimony, which could have been used effectively to impeach the witness if he were to testify differently at trial. *Id*. Thus, contrary to the District Court's ruling in this case, *Brady* does require the Government to produce material exculpatory information in its possession that will reduce or "eliminate the litigation risks associated with calling a witness whose testimony is uncertain" to the defendant. (SPA45).

In sum, Wilson-Foley's statements to the Government were suppressed.

### 2. Wilson-Foley's Statements to the Government Were Favorable to the Defense and Material

Wilson-Foley's statements to the Government were highly exculpatory and material, as they directly contradicted the Government's theory at trial that

44

Rowland, Wilson-Foley and Foley all believed from the start that Rowland's job at Apple was a sham. If Wilson-Foley believed that Rowland was being hired for a real job at Apple when she told him about the job offer, then Rowland's "I get it" email response (A556) could not have referred to a criminal scheme. Thus, Wilson-Foley's statements to the Government contradicted the Government's interpretation of the "I get it" email and its theory of the case.

Importantly, Rowland's "I get it" email was a centerpiece of the Government's case. Foley testified that by writing "I get it," Rowland meant that he understood that he was "really working for the campaign." (A177). During summations, the Government referred to the "I get it" email on four separate occasions, and the Government also highlighted the email during campaign staffer Christopher Syrek's testimony. (A255, 431, 435, 437, 438-39).

Wilson-Foley's statements to the Government that she believed she was conveying a real job offer to Rowland cast doubt on the Government's narrative. Evidence that the Government was wrong about the "I get it" email would have "put the whole case in such a different light as to undermine confidence in the verdict." *Mahaffy*, 693 F.3d at 127 (internal quotations omitted).

Had the Government disclosed Wilson-Foley's statements denying that she believed Rowland's job at Apple was a "sham," there is a reasonable probability that the outcome of the proceeding would have been different. The suppressed

45

evidence would have allowed Rowland, among other things, to impeach Foley's interpretation of the "I get it" email and to highlight the fact (also concealed by the Government) that, during the alleged conspiracy, Foley repeatedly assured his wife (the supposed co-conspirator) that Rowland's work at Apple was real and legitimate. Rowland would have also been able to cross-examine Foley on the fact that that the Government withdrew his plea offer when his wife would not change her version of events to suit the Government. The evidence of the Government's coercive tactics would have cast further doubt on Foley's decision to change his account and implicate Rowland in wrongdoing. *See United States v. Scheer*, 168 F.3d 445, 458 (11th Cir. 1999) (holding that Government violated *Brady* by failing to disclose that prosecutor threatened witness with return to prison if he did not provide favorable testimony).

Had the Government fulfilled its *Brady* obligations, Rowland would have also likely called Wilson-Foley to testify that she believed Rowland was being hired for a real job and that Foley repeatedly assured her that Rowland was performing real work. There is a reasonable probability that this testimony would have changed the outcome of the proceeding.

Importantly, contrary to the District Court's ruling, Wilson-Foley's statements to the Government that she believed getting Rowland a job at Apple would benefit her campaign are not inculpatory. First, Wilson-Foley did not

46

communicate her belief to Rowland, so it could not have affected his state of mind. Second, under the campaign finance laws, it is lawful to provide someone with a real job with the hope that they would then volunteer for a campaign. Volunteer services are not a campaign "contribution" for purposes of campaign finance law. *See* 52 U.S.C. § 30101(8)(B)(i); 11 C.F.R. § 100.74. In other words, for purposes of campaign finance law, volunteer services are not a thing "of value made by any person for the purpose of influencing any election for Federal office." *See* 11 C.F.R. § 100.52 (defining "contribution"). Accordingly, it is legal to hire an individual to perform real work outside of the campaign in part so the individual would be more likely to become a campaign volunteer. *See* 11 C.F.R. § 100.54 (stating that no contribution results if a salaried employee is permitted to work for a campaign as a volunteer during normal work hours, so long as the time is made up by the employee); 11 C.F.R. § 100.74. Creating an environment that would make it more likely that an individual would volunteer for a campaign is not a campaign contribution or a crime. Indeed, a restriction on employees' volunteer activities would violate the First Amendment. *See*, *e.g.*, *McCutcheon v. FEC*, 134 S. Ct. 1434, 1449 (2014) ("*Buckley* observed that a supporter could vindicate his associational interests by personally volunteering his time and energy on behalf of a candidate."); *Randall v. Sorrell*, 548 U.S. 230, 260 (2006) (holding that Vermont campaign finance statute was unconstitutional in part because it "may well impede

47

a campaign's ability effectively to use volunteers, thereby making it more difficult for individuals to associate in this way") (plurality opinion).

Had the Government fulfilled its *Brady* obligations, Rowland would have also been able to highlight the fact that Wilson-Foley pleaded guilty only after the Government withdrew her husband's plea offer in retaliation for her refusal to change her account of events. Evidence of the Government's coercive tactics would have cast doubt on both Foley's trial testimony and Wilson-Foley's statements during her guilty plea allocution.

To be sure, the Government would have been able to cross-examine Wilson-Foley with her plea allocution. But evidence with both inculpatory and exculpatory characteristics can be material where "its exculpatory character harmonized with the theory of the defense." *United States v. Triumph Capital Group*, 544 F.3d at 164; *see Mahaffy*, 693 F.3d at 130. In this case, Wilson-Foley's statements to the Government refute the Government's theory that she entered a criminal scheme with Rowland when she conveyed Foley's job offer. In addition, Rowland would have argued at trial that Wilson-Foley's half-hearted guilty plea was the product of duress, that is, Wilson-Foley admitted to a misdemeanor she did not commit (1) to avoid a felony prosecution (2) to protect her husband from being prosecuted for the numerous felonies he committed, (3) to protect her husband's friends and family from prosecution and (4) only after the Government rescinded her husband's plea

48

offer when Wilson-Foley refused to tell the Government what it wanted to hear. A jury could reasonably credit Wilson-Foley's exculpatory statements and discredit her statements in connection with her guilty plea as being the product of tremendous pressure on her and her family to resolve this matter. A jury could also reasonably conclude that, even if Wilson-Foley at some point had criminal intent, Rowland did not possess such intent.

Perhaps the best evidence that Wilson-Foley's statements were material is the prosecutors' own reaction to them. During her interview, the prosecutors urged Wilson-Foley to change her account with implicit threats. (*See* A513 (reporting that prosecutor told Wilson-Foley that "the next few minutes are very important for you; it is not credible to us that you didn't know that the Apple job was a sham"). After Wilson-Foley refused to change her account, the prosecutors threatened to rescind her husband's plea offer and said that she "did too much damage." (A514). The Government recognized Wilson-Foley's statements were central to the charges in this case. Because the Government did not disclose these statements to Rowland, the verdict cannot stand.

## III. The Conviction Should Be Vacated Because of Erroneous Jury Instructions

This Court should also vacate the conviction because of errors in the District Court's jury instructions. The District Court (1) wrongly instructed the jury on the theory of the defense, (2) wrongly declined to instruct the jury on relevant

principles of campaign finance law, and (3) erroneously instructed the jury regarding the Government's Section 1519 omission theory. These errors require a new trial.

A "criminal defendant is entitled to a jury charge that reflects any defense theory for which there is a foundation in the evidence." *United States v. Allen*, 127 F.3d 260, 265 (2d Cir. 1997) (internal quotations omitted); *see United States v. Goldson* 954 F.2d 51, 55 (2d Cir. 1992) ("The fact that Goldson's requested jury instruction was inconsistent with his testimony was not a correct reason for the court to have refused to give the instruction."). To successfully challenge a jury instruction, a defendant must show that his requested charge "accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced." *United States v. Bah*, 574 F.3d 106, 113 (2d Cir. 2009) (internal quotations omitted).

### A.     The District Court Erroneously Changed the Theory of the Defense

Rowland asked that the jury be instructed on the defense theory that, regardless of what Foley personally thought (but did not tell anyone (A219)), Rowland believed he was being paid for work at Apple. For example, with respect to Counts Four through Seven, Rowland asked that the jury be instructed as follows: "Mr. Rowland contends that he understood that any payments he received were for work performed for Apple Healthcare, Inc." (A293). This defense was

50

supported by, among other things, (1) the fact that Foley never told Rowland or anyone else that Rowland was being paid to work for the campaign (A182, 219), (2) the evidence that Rowland began to work for Apple following a meeting with Foley where they discussed Rowland's job responsibilities at Apple (A179-84, 218), and (3) evidence of Rowland's work at Apple. Moreover, as discussed in Section IV.A. below, the District Court incorrectly excluded evidence of Rowland's work at Apple and Rowland's belief that he was being paid to work at Apple.

Even though the record supported Rowland's proposed instruction, the District Court declined to deliver it on the ground that "[i]t's a proxy for his testimony, which the jury didn't hear." (A318). Then, over Rowland's objection, the Court changed the proposed theory of the defense instruction by removing the phrase "he understood that." (A320, 323, 440). As a result, the Court instructed the jury that Rowland "contends that any payments he received were for work performed for Apple Healthcare, Inc." (A401-02). This did not properly describe Rowland's defense, which allowed for the possibility that Foley (but not Rowland) believed that Rowland was being paid for campaign work. (*See, e.g.*, A91 ("If there was a conspiracy here, it was a conspiracy of one."); A434). As a result of this instructional change, the Court incorrectly informed the jury the Rowland's defense depended on whether *Foley*, rather than Rowland, believed that his

51

consulting payments were for campaign work. This erroneous change prejudiced Rowland.

### B.     The District Court Erroneously Declined To Instruct the Jury that Candidates May Personally Pay Campaign Staff

The Court also erroneously declined to instruct the jury that

> [u]nder FEC rules: (1) a candidate can contribute to the candidate's own campaign in unlimited amounts; (2) a candidate can do so by donating to the campaign or by purchasing goods or services directly with the candidate's own money; and (3) in either case, the candidate's contribution to the campaign must be reported to the FEC.

(*See* A292, 335-37). This instruction is an accurate statement of the law. *See* 11 C.F.R. §§ 100.52(d)(1), 100.111(e)(1), 104.13, 110.10. Moreover, this instruction was necessary (1) to correct the misimpression from Greenberg's testimony that payments to campaign consultants from anyone other than the campaign (including Greenberg himself) were "wrong" and would be "secret." (A105, 127-28) and (2) to allow the jury to conclude that the terms of the Greenberg draft contract, which provided that Greenberg would personally pay Rowland, (a) were consistent with the campaign finance laws and (b) would have created a disclosure obligation on Greenberg's part. Because the Court declined to instruct the jury on relevant provisions of campaign finance law, a new trial is warranted.

52

### C. The District Court Erroneously Instructed the Jury on the Government's Section 1519 Omission Theory

The District Court erroneously instructed the jury over objection that, under Section 1519, (1) a "defendant falsifies a document . . . by knowingly omitting from the document any material fact" and (2) a "fact is material if it had a natural tendency to influence, or was capable of influencing the government's, here the Federal Election Commission's ("FEC") and/or the United States Department of Justice's, decisions or activities." (A340-42, 375, 424-25, 440). As set forth in Section I.B.1., this instruction was erroneous, as it would extend criminal exposure to the preparation of any document that did not include any fact of interest to any government agency. Indeed, under the Court's jury instructions, every document would necessarily be falsified, as no document can include every fact that is material to every Government agency. Accordingly, even if the evidence were sufficient to support a conviction on the Section 1519 charges (and it is not), the instructional error would require a new trial.

## IV. The Conviction Should Be Vacated Because of Serious Evidentiary Errors

The District Court's one-sided application of the Rules of Evidence also requires that the conviction be vacated. On one hand, the District Court erroneously excluded on hearsay grounds Rowland's emails and text messages that Rowland offered, not for their truth, but to show that Rowland was performing

work for Apple. On the other hand, the District Court (1) permitted Foley to opine about the meaning of Rowland's emails and (2) permitted Greenberg confederates Katz and Fischer to testify about what Greenberg told them and to opine that Rowland's alleged proposal "didn't smell right." These erroneous evidentiary ruling prejudiced Rowland's defense.

### A. The District Court Erroneously Excluded Rowland's Communications with Apple

The District Court erroneously excluded on hearsay grounds emails and other non-hearsay evidence Rowland offered to show that he (1) believed he was being paid to work for Apple and (2) was in fact working for Apple. An out-of-court statement offered, not for its truth, but for another purpose (such as the fact that the statement was made) is not hearsay. *See, e.g.*, *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 89-90 (2d Cir. 2014). Because Rowland's Apple-related emails, statements and other actions were not being offered for their truth, but only for the fact that Rowland sent them in the course of his work for Apple, the Court erred in excluding them from evidence.

For example, the Court erroneously excluded on hearsay grounds Defense Exhibit 136, which comprised an email exchange between Rowland and Apple Chief Operating Officer Bedard about unionization efforts. (A284-89, 578). Rowland offered this email exchange, not for its truth, but to establish that he was,

54

in fact, working at Apple and taking the initiative to communicate with Bedard about Apple-related issues.

Similarly, the Court erroneously excluded a text message exchange between Rowland and Bedard regarding union issues at Apple, in which Rowland asked, "was the contract signed yesterday? the union contract" (A305-09, 580). Because Rowland simply asked Bedard a question (which is not capable of being true or false), Rowland's text message could not have been offered for its truth, and the District Court committed legal error in ruling otherwise. The District Court also erroneously excluded testimony about Rowland's advice to Apple when Foley was soliciting campaign contributions from Apple employees. (A302-03). This testimony was offered, not for its truth, but to show that Rowland was working on behalf of Apple.

This erroneously excluded evidence would have established that Rowland was doing actual work at Apple and placing the interests of Apple above those of the campaign. Bedard's testimony was not a substitute for Rowland's actual messages and emails, as the Government labeled Bedard a coconspirator and argued to the jury that he was lying at trial. (A417, 432-33). Because the question of whether Rowland was actually working for Apple was a central issue in the case, the improper exclusion of this non-hearsay evidence prejudiced Rowland.

55

### B. The District Court Erroneously Admitted Opinion Testimony Regarding the Meaning of Rowland's Emails

The District Court erroneously permitted Foley to opine on the meaning of Rowland's email messages. Over objection, Foley was permitted to opine about what Rowland meant when he wrote such common phrases as "I get it" (A177), "this arrangement" (A195), "our agreement" (*id.*), and "cover" (A196).

"[W]here there is a logical, coherent conversation with a plain meaning, the government must establish some foundation to support [the witness's] testimony that the conversation was not what it appeared to be." *United States v. Garcia*, 291 F.3d 127, 141 (2d Cir. 2002). This foundational requirement for lay opinion testimony "is designed to provide assurance again the admission of opinions which would merely tell the jury what result to reach." *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004) (internal quotations and brackets omitted).

There was no foundation for Foley's lay opinion testimony in this case. Foley testified that (1) he seldom met with Rowland (A201) and (2) he never told Rowland or anyone else that Rowland's job at Apple was a sham or a subterfuge (A182, 219). Accordingly, in this case, just as in *Garcia*, there was no foundational evidence explaining the basis for Foley's opinion regarding what Rowland meant. *See* 291 F.3d at 141. Moreover, because Rowland's emails were readily understandable, Foley's opinion testimony should have been excluded on the ground that it was not helpful to the jury. *See id.* at 142. In interpreting Rowland's

56

emails, Foley simply told the jury what inferences to draw from the evidence, and "[t]hat is not the point of lay opinion evidence." *United States v. Grinage*, 390 F.3d at 750. Because the Government made Foley's interpretation of the "I get it" email a centerpiece of its case, this testimony cannot be deemed harmless. *See id.* at 751.

## C. The District Court Erroneously Admitted Hearsay and Opinion Testimony from Katz and Fischer

The District Court also erroneously allowed Katz and Fischer (1) to testify about Greenberg's statements that Rowland had proposed to be paid by the Simon Foundation (A121-22, 130-31, 142-43) and (2) to opine about propriety of this alleged proposal. (A122, 133, 144-45).

Greenberg's statements to Fischer and Katz that Rowland had proposed to be paid by the Simon Foundation were inadmissible hearsay—out-of-court statements offered for their truth. During Katz's testimony, the District Court instructed the jury that the testimony was being received "for what Mr. Katz was told by Mr. Greenberg, not whether what he was told was, in fact, truthful or accurate." (A143). But Katz's state of mind was not relevant to any issue in this case. Moreover, during summations, the Government used Katz's testimony for its truth, that is, as evidence that Rowland had made the proposal to Greenberg. (A426, 429). Because Greenberg's out-of-court statements were improperly admitted and then used by the Government for their truth, Rowland suffered prejudice. *See United States v. Gomez*, 617 F.3d 88, 91 (2d Cir. 2010) (rejecting as "not credible"

57

the Government's argument that testimony was admitted for a valid, non-hearsay purpose when Government during summations "argued the very hearsay use of the evidence which it now contends it was not offering").

Importantly, the District Court properly declined to admit Greenberg's statements to Fischer and Katz pursuant to Federal Rule of Evidence 801(d)(B)(1) as prior consistent statements. (A140 ("I think the approach that we have forged is one that has eliminated the issue of prior consistent statement."); A147). This was correct, because Rowland never claimed during trial that Greenberg had a recent motive to fabricate his testimony about Rowland's proposal. *See Tome v. United States*, 513 U.S. 150, 157 (1995). At the time of trial, prior consistent statements were admissible under Federal Rule of Evidence 801(d)(B)(1) only to rebut a claim that a witness had a recent motive to fabricate false testimony. Prior consistent statements were not admissible "to bolster the witness merely because she has been discredited." *Tome*, 513 U.S. at 157.

The District Court also erroneously permitted Katz to testify over objection that Rowland's alleged proposal to be paid by the Simon Foundation "didn't smell right." (A122, 144-45). Katz's opinion about what "smelled right" was not relevant to any issue in this case. Moreover, the Court compounded this error by (1) not instructing the jury on the relevant provisions of campaign finance law, which allow candidates to make unlimited donations to their own campaigns, and (2)

58

preventing Katz from being cross-examined about the fact that, during the campaign, the Simon Foundation employed the head of a Tea Party organization who, in turn, volunteered for Greenberg's campaign. (A148-49). This cross-examination would have called into question Katz's testimony about what, in his view, "smelled right."

The Court similarly erred in initially allowing Fischer to testify over objection that Rowland's proposal was "illegal." (A133). Although the Court later provided a curative instruction (A138-39), the damage had been done. Moreover, Fischer's view about what was legal was not relevant to any issue in the case.

This erroneously admitted evidence wrongly tarnished Rowland and prejudiced his defense.

## V. The Limits on Individual Campaign Contributions Are Unconstitutional

Counts Six and Seven charged that Rowland violated the individual campaign contribution limits set forth in 2 U.S.C. § 441a(a)(1)(A) ("Section 441a").[3] Rowland's conviction on these counts should be reversed, because the individual campaign contribution limits in Section 441a unconstitutionally infringe on the First Amendment, particularly as applied here to a husband's contribution to his wife's campaign. *See*, *e.g.*, *McCutcheon v. FEC*, 134 S. Ct. at 1446 (holding that aggregate limits on how much an individual can contribute to candidates are

---

[3] Section 441a is now found at 52 U.S.C. § 30116.

59

unconstitutional). This argument would require that the Court extend the reasoning in *McCutcheon* and overrule *Buckley v. Valeo*, 424 U.S. 1 (1976), which is binding on this Court. Accordingly, Rowland raises this issue to preserve the arguments asserting the unconstitutionality of base contribution limits for further review.

## VI.  The District Court Erred in Calculating the Guidelines Offense Level

Rowland's sentence was procedurally unreasonable, because the District Court erred in calculating the offense level under the United States Sentencing Guidelines. The District Court determined that the base offense level was 8 pursuant to U.S.S.G. § 2C1.8 and then ruled that the offense level should be increased by six levels because the "value of the illegal transactions" exceeded $30,000. (A537). The Court made this determination even though it assumed, based on Foley's statements to the Government, that Rowland's services had a value of $5,000 to Apple. (A515, 534). The Court ruled that because the value to Apple was simply a "byproduct" of the alleged scheme, the value of Rowland's services to Apple should not be deducted from the $35,000 in payments to determine the Guidelines enhancement. (A537).

This ruling was erroneous. Section 2C1.8(b)(1) states that the offense level adjustment should be determined based on the "value of the illegal transactions." The "illegal transactions" do not include the payments Rowland received for his work at Apple. And even Foley admitted that when he hired Rowland, he thought

60

Rowland could be of some value to Apple. (A221). The portion of payments to Rowland attributable to Rowland's work for Apple (at least $5,000) are not part of the "value of the illegal transactions." Accordingly, the District Court erred in applying a six-level, rather than a four-level, offense level enhancement. In the event that the Court does not vacate Rowland's conviction, it should remand this case for resentencing with a properly calculated Guidelines sentencing range.

## CONCLUSION

The judgment of conviction should be reversed.

Respectfully submitted,

_s/ Andrew L. Fish_
Andrew L. Fish
R. James DeRose, III
Locke Lord LLP
3 World Financial Center
New York, NY 10281
(212) 415-8541
afish@lockelord.com

*Counsel for Defendant-Appellant*

**Certificate of Compliance with Fed. R. App. P. 32(a)**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, as measured by Microsoft Word, this brief contains 13,540 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14 point font for text and footnotes.

 s/ Andrew L. Fish
Andrew L. Fish
Locke Lord LLP
3 World Financial Center
New York, NY 10281
(212) 415-8541
afish@lockelord.com