# 15-985

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

v.

JOHN G. ROWLAND,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of Connecticut, No. 3:14-cr-79 (JBA)

## REPLY BRIEF FOR APPELLANT

Andrew L. Fish
R. James DeRose, III
LOCKE LORD LLP
3 World Financial Center
New York, NY 10281
(212) 415-8541
afish@lockelord.com

*Counsel for Defendant-Appellant*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ............................................................................. 1

ARGUMENT ..................................................................................... 2

I. The Conviction Should Be Reversed Because Rowland Did Not Violate Section 1519 .................................................................. 2

  A. The Government's Expansive Interpretation of Section 1519 Should Be Rejected ................................................................. 3

    1. Documents Cannot Be Falsified Through Omission Absent a Duty to Disclose .......................................................... 3

    2. False Certification Cases Do Not Support the Government's Sufficiency Argument ................................ 7

  B. The Draft Contract Rejected by Greenberg Was Not Falsified ................. 9

  C. The Shelton Contract Was Not Falsified ................................. 12

  D. The Jury's Verdict on All Counts Should Be Vacated Because of Prejudicial Spillover .................................................. 13

    1. The Greenberg-Related Evidence Would Not Have Been Admissible Under Rule 404(b) ............................... 13

    2. The Admission of the Greenberg-Related Evidence Was Not Harmless ................................................................ 16

II. The Conviction Should Be Vacated Because of the Government's *Brady* Violations .................................................................... 17

  A. The Government Suppressed Wilson-Foley's Interview Statements and Her Refusal to Change Her Account ................. 18

  B. The Suppressed Evidence Was Favorable to the Defense and Material ................................................................... 23

III. The Conviction Should Be Vacated Because of Erroneous Jury Instructions .................................................................................26

   A. The Theory of the Defense Charge ...........................................26

   B. The Requested Charge that Candidates May Personally Pay Campaign Staff ........................................................................27

   C. The Section 1519 Omission Theory ........................................27

IV. The Conviction Should Be Vacated Because of Serious Evidentiary Errors .............................................................................................29

   A. The Erroneous Exclusion of Rowland's Communications with Apple......29

   B. The Erroneous Admission of Opinion Testimony Regarding the Meaning of Rowland's Emails .................................................30

   C. The Erroneous Admission of Hearsay and Opinion Testimony from Katz and Fischer..................................................................30

  V. The District Court Erred in Calculating the Guidelines Offense Level........31

CONCLUSION ................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Basic Inc., v. Levinson*,
    485 U.S. 224 (1988)......................................................................3, 4

*Brady v. Maryland*,
    373 U.S. 83 (1963)..........................................................................18

*Jackson v. Virginia*,
    443 U.S. 307 (1979)........................................................................11

*Kosakow v. New Rochelle Radiology Associates, P.C.*,
    274 F.3d 706 (2d Cir. 2001)..............................................................4

*Lewis v. Connecticut Commissioner of Correction*,
    790 F.3d 109 (2d Cir. 2015)............................................................23

*United States v. Gomez*,
    617 F.3d 88 (2d Cir. 2010)..............................................................31

*United States v. Heras*,
    609 F.3d 101 (2d Cir. 2010)............................................................28

*United States v. Jespersen*,
    65 F.3d 993 (2d Cir. 1995)..............................................................10

*United States v. Lanham*,
    617 F.3d 873 (6th Cir. 2010)..........................................................5, 6

*United States v. Mahaffy*,
    693 F.3d 113 (2d Cir. 2012)........................................................20, 28

*United States v. Mandanici*,
    729 F.2d 914 (2d Cir. 1984)..........................................................7, 8

*United States v. McDermott*,
    245 F.3d 133 (2d Cir. 2001)............................................................30

*United States v. Moyer*,
    674 F.3d 192 (3d Cir. 2012)..........................................................5, 6

iii

*United States v. Scott*,
   677 F.3d 72 (2d Cir. 2012)..............................................................14

*United States v. Shah*,
   44 F.3d 285 (5th Cir. 1995)...............................................................7

*Yates v. United States*,
   135 S. Ct. 1074 (2015) .........................................................3, 4, 28

**Statutes, Rules & Other Authorities**

18 U.S.C. § 1001.................................................................................7, 20

U.S.S.G. § 2C1.8(b)(1) .............................................................................31

11 C.F.R. § 100.74 ....................................................................................16

Fed. R. Evid. 404(b)(1) .............................................................................15

# INTRODUCTION

The Government now admits that it "temporarily" rescinded Brian Foley's plea offer because Lisa Wilson-Foley steadfastly denied in a Government interview that she believed Rowland's job at Apple Rehab ("Apple") was a sham to pay for campaign work. The Government also suggests that it withdrew its offer not to prosecute Wilson-Foley because she would not tell the Government what it wanted to hear. These actions confirm that the Government correctly viewed Wilson-Foley's interview statements as both important and damaging to its case. Remarkably, the Government does not even attempt to explain why it then concealed these exculpatory statements from Rowland. Because the Government violated its *Brady* obligation to disclose material exculpatory information, Rowland's conviction cannot stand.

With respect to the charges under 18 U.S.C. § 1519 ("Section 1519"), the Government cannot identify a prosecution remotely like this one. Quite simply, Rowland's drafting of a contract proposal that Mark Greenberg immediately rejected did not violate Section 1519. Prejudicial spillover from the Greenberg-related evidence requires a new trial on the remaining counts.

In addition, the Government's attempt to defend the District Court's erroneous jury instructions and evidentiary rulings falls short. Notably, the

Government does not even address the erroneous admission of testimony that Rowland's alleged proposal did not "smell right."

In light of the cascade of errors during trial, the jury's verdict cannot stand. If Rowland had not been improperly tarred by Greenberg and his confederates, if the Government had complied with its *Brady* obligation, and if the District Court had properly instructed the jury and properly applied the Rules of Evidence, there is a reasonable probability that the result of the trial would have been different. Accordingly, Rowland's conviction cannot stand.

## ARGUMENT

### I.   The Conviction Should Be Reversed Because Rowland Did Not Violate Section 1519

Rowland's Section 1519 convictions cannot stand because neither the rejected Greenberg proposal nor the Shelton contract are "falsified" documents within the meaning of that statute. The Government seeks to defend the Section 1519 convictions with its overly expansive omission theory, under which every document would be "falsified." This Court should reject the Government's attempt to convert Section 1519, a narrow "anti shredding" provision, into an expansive obstruction of justice statute. Further, spillover prejudice from the wrongly admitted Greenberg-related evidence requires a new trial on the remaining counts relating to the Wilson-Foley campaign.

**A. The Government's Expansive Interpretation of Section 1519 Should Be Rejected**

**1. Documents Cannot Be Falsified Through Omission Absent a Duty to Disclose**

As set forth in Rowland's opening brief, Section 1519 is an "anti shredding" statute that must be construed narrowly in light of the statute's purpose—"to prohibit, in particular, corporate document-shredding to hide evidence of financial wrongdoing." *Yates v. United States*, 135 S. Ct. 1074, 1081 (2015) (plurality opinion); *see id.* at 1090 (Alito, J., concurring) (rejecting Government's broad reading of the statute as "implausible"). The Government fails to address the Supreme Court's narrow construction of Section 1519 in *Yates* (other than to observe that *Yates* involved fish rather than contracts) and continues to argue that any document that *omits* a fact material to any governmental agency is "falsified." (Gov't Br. 26 n.4, 57). This unprecedented and overbroad reading of Section 1519, under which every document would be "falsified," is not supported by the cases the Government cites and is inconsistent with *Yates*. If Section 1519 were interpreted in the overbroad manner urged by the Government, the statute would be unconstitutionally vague. (*See* Def. Br. 34).

The Government argued both at trial and on appeal that Rowland's proposal to Greenberg was "falsified" through omission. (*See* A427; Gov't Br. 25 n.3). But, absent a duty to disclose, an omission is not false or misleading. *See*, *e.g.*, *Basic*

3

*Inc., v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 725 (2d Cir. 2001) ("The law has long been that *where a party has a legal duty to speak*, silence can constitute an affirmative 'misrepresentation.'" (emphasis added)). Thus, as set forth in Rowland's opening brief, the Government's omission theory is viable only if Section 1519 creates an affirmative obligation to include all information material to any governmental agency in every document prepared in the course of business or personal affairs. (Def. Br. 32, 34). Section 1519 creates no such obligation.

The Government's expansive interpretation of Section 1519 is inconsistent with *Yates*. In *Yates*, the Supreme Court concluded that Section 1519 must be construed narrowly in part because Congress did not locate it among Title 18's general obstruction statutes but rather placed it after other statutes "prohibiting obstructive acts in specific contexts." *Yates*, 135 S. Ct. at 1083-84. Accordingly, Congress "ranked § 1519, not among the broad proscriptions, but together with specialized provisions expressly aimed at corporate fraud and financial audits." *Id.* at 1084. Such a specialized provision should not be interpreted to create an affirmative obligation to include all information material to governmental agencies in draft contracts and other documents.

The two cases the Government cites to support its omission theory—*United States v. Moyer*, 674 F.3d 192 (3d Cir. 2012), and *United States v. Lanham*, 617 F.3d 873 (6th Cir. 2010)—are inapposite. They involved false law enforcement reports written to cover up official misconduct and prepared by officials with a duty to include relevant information in their official reports. *See Moyer*, 674 F.3d at 207. The documents at issue in this case contain no similar recitation of historical events, nor is there a duty to include facts of interest to the Government in private contracts.

In *Moyer*, the Third Circuit held that there was sufficient evidence to support the Section 1519 conviction of a police chief who submitted false police reports in connection with a racially motivated assault. Those reports (1) did not identify the assailants despite that information being known to the police; and (2) were rife with additional false statements, including that the chief had advised the district attorney's office that the police department had a conflict of interest (one of the assailants was the son of a woman who was dating a police officer) and had suggested that the district attorney's office should assume responsibility for the case. *Id.* at 200-01, 207-08. Because the police chief had a duty to identify the suspects in his report, the Court rejected the police chief's argument that an omission theory was improper. *Id.* at 207 ("It borders on the ridiculous to assert that a Chief of Police would not have a duty to disclose the identity of suspects in

5

his official police reports or, conversely, that withholding the names of suspects—known to him—in those official police reports would be deemed acceptable.").

In *Lanham*, the Section 1519 charges arose from incident reports prepared by prison guards who had decided to "scare" an arrestee by placing him in a dangerous general population cell, where the arrestee was raped. *Lanham*, 617 F.3d at 879. After the rape, one guard wrote a report stating that he went to some prisoners in the general population cell and then returned to a section of the detention center. *Id.* The Sixth Circuit ruled that this was false because, in fact, the guard "returned to booking after talking with [a prisoner in the general population cell whom the guards told to 'f-ck with' the arrestee], rather than proceeding immediately to [a section of the detention center] as stated in the written report." *Id.* at 887.

In sum, the Section 1519 charges in *Moyer* and *Lanham* related to law enforcement reports prepared by officials who sought to conceal official misconduct by violating their duty to report information accurately. These cases do not support the Government's argument that, under Section 1519, all documents (including proposals and contracts between private parties) that omit any fact material to any governmental agency are "falsified" documents.

6

## 2. False Certification Cases Do Not Support the Government's Sufficiency Argument

Rowland's opening brief explained that a contract is "falsified" only if it (1) represents a forgery or alteration of a preexisting contract or (2) contains misrepresentations of historical fact. (Def. Br. 29). In response, the Government cites two cases where certifications to the Government to obtain payments were deemed false statements punishable under 18 U.S.C. § 1001. (Gov't Br. 22). These cases are distinguishable.

In *United States v. Shah*, 44 F.3d 285 (5th Cir. 1995), the defendant responded to a General Services Administration solicitation by submitting a certification that he would not disclose bid price information to others. *Id.* at 287. In fact, before submitting the certification, the defendant had contacted a competitor and suggested that they engage in a bid rigging scheme in which they would fix and exchange price information. *Id.* The Fifth Circuit held that there was sufficient evidence to support the jury's verdict because the certification "implicitly represents [the defendant's] present intent" not to exchange price information, and the defendant's contact with a competitor established that the certification was false. *Id.* at 294.

In *United States v. Mandanici*, 729 F.2d 914 (2d Cir. 1984), the defendant owned an apartment building, and he submitted various documents to a local housing authority to take advantage of a Section 8 program which guaranteed

7

rental income to landlords who rehabilitated buildings in need of repair. *Id.* at 916.
The defendant initially submitted an application summarizing the proposed
rehabilitation and its cost. *Id.* at 917. The local housing authority approved the
application and stated that the defendant would have to invest $88,000 in
rehabilitation work to participate in the program. *Id.* The defendant then submitted
a contract which specified the $88,000 in rehabilitation work and stated that it
would be completed within 60 days. *Id.* After submitting this contract, the housing
authority began paying the defendant rent subsidies. The defendant later submitted
a different contract stating that the units had been rehabilitated in accordance with
the earlier contract. *Id.* at 918. At trial, the defendant was convicted of a false
statement charge in connection with each of these three documents.

On appeal, this Court reversed the false statement conviction based on the
first document (the application) because the defendant had not represented in the
application that he would complete the proposed rehabilitation or that he would
spend the estimated amount. *Id.* at 920. In contrast, this Court affirmed the false
statement convictions based on the contracts because the defendant falsely stated
that he would perform $88,000 in rehabilitation work when he had no such
intention and that the rehabilitation work had been completed. *Id.* at 920-21.

In this case, unlike *Shah* and *Mandanici*, the purportedly falsified documents
contain no certifications (false or otherwise) to the Government or anyone else.

8

Accordingly, the Government's false certification cases have no relevance to the question of whether the rejected Greenberg draft contract or the Shelton contract can be deemed "falsified" under Section 1519.

**B.    The Draft Contract Rejected by Greenberg Was Not Falsified**

The conviction on Count One cannot stand because Rowland did not "falsify" his draft contract proposal to Greenberg. Most fundamentally, a rejected contract proposal cannot be a falsified document. The Government argues that the "Greenberg contract" was "wholly fictitious" (Gov't Br. 23), but this misses the point that there was no Greenberg contract. Greenberg rejected Rowland's proposal immediately, and Rowland never worked for Greenberg in any capacity. (A118, 123, 124). The rejected draft contract contains no factual statements, let alone false statements. (A554-55).

Even if a rejected draft contract proposal could be falsified (and it cannot), Greenberg acknowledged that the broad language in Rowland's proposal encompassed political consulting services. (A114-15). In addition, contrary to the Government's assertion (Gov't Br. 4), Rowland and Greenberg had discussed fundraising for the Simon Foundation before Rowland presented Greenberg with the proposed draft contract that included those services. (A116). The Government nevertheless insists that the rejected proposal—which encompassed political consulting services as well as previously discussed fundraising services—was

9

"falsified" because it purportedly "*omitt[ed]* any specific reference to the only service that Rowland actually proposed to undertake." (Gov't Br. 25 n.3 (emphasis added)). But, as set forth above, absent a duty to disclose, a document cannot be falsified through omission. Moreover, a contract proposal cannot be deemed falsified simply because the Government would have preferred contract terms that were more specific.

The Government wrongly argues that the Greenberg proposal was analogous to the contract at issue in *United States v. Jespersen*, 65 F.3d 993 (2d Cir. 1995). In that case, an IRS employee had received free work from a contractor. After an investigation commenced, the employee asked the contractor to provide a receipt relating to the work the contractor had performed. *Id.* at 996. The contractor then prepared a phony contract falsely stating that the IRS employee had paid an initial deposit and made additional payments for the work. *Id.* The employee delivered to an IRS inspector the contract reflecting payments that were never made. *Id.* This Court held that a jury could conclude that the employee obstructed a grand jury investigation because the contract "fraudulently showed that [the contractor] had been paid for the work performed." *Id.* at 998. There were no similar false statements of historical fact in the Greenberg draft contract proposal.

In an effort to defend the jury's verdict on Count One, the Government mischaracterizes the record. For example, the Government wrongly suggests that Greenberg did not reject Rowland's proposed contract "for several months." (Gov't Br. 2, 5). In fact, Greenberg testified that he rejected the proposed contract on the day Rowland presented it to him. (A118, 124). The Government also fails to note that the draft contract defines Greenberg as the "Company," so the reference in the proposal to the "Company" is a reference to Greenberg himself. (A554).

The Government also wrongly states that Rowland's contract proposal contemplated payments from sources that would "circumvent[] federal election reporting requirements." (Gov't Br. 1-2). In fact, Rowland proposed a contract between Rowland's consulting company and Greenberg personally. (A554). As set forth in Rowland's opening brief (and not disputed by the Government), campaign finance laws permit candidates to pay campaign consultants personally, and such payments must be reported to the Federal Election Commission (the "FEC"). (Def. Br. 52).

Finally, the Government's reference to Section 1519's intent element is puzzling. (Gov't Br. 23-24). The Government has the burden of establishing every element of the charged offense. *See*, *e.g., Jackson v. Virginia*, 443 U.S. 307, 313-14 (1979). Accordingly, the existence of an intent element does not relieve the Government of the burden of establishing that the defendant falsified documents.

11

Because no rational juror could conclude that the rejected Greenberg proposal was falsified, the conviction on Count One should be reversed.

### C.     The Shelton Contract Was Not Falsified

As Rowland set forth in his opening brief, his contract with Apple attorney Christian Shelton was not "falsified"—it was not altered and did not contain false statements of historical fact. (Def. Br. 35). Further, contrary to the Government's suggestion (Gov't Br. 9-10, 26), Rowland did not see early versions of the Shelton contract that mentioned campaign assistance. (GA267-68). Foley and Shelton had removed this language before providing a draft to Rowland. (A563-65). The Government observes that Rowland proposed changes to the Shelton contract that "largely tracked the Greenberg contract" (Gov't Br. 25-26). But the Government fails to note that the Greenberg proposal itself appeared to have been "cut and paste" from Rowland's prior contracts. (A119, 126, 555). Rowland simply proposed contract language with which he was familiar.

The Government makes much of the fact that Rowland suggested that the contracting party be changed to his consulting firm because "that will give us more cover as well vs. individual." (A562). But Foley acknowledged that he wanted to keep Rowland's relationship with Apple covert for business reasons. (A226 ("Well, since there was a democratic governor and legislature, I thought it may be hurtful to the company if they knew that Mr. Rowland was consulting for

Apple.")). Foley testified that Shelton and he structured the contract so Apple's relationship with Rowland would not be made known to the administration of Connecticut's Democratic governor. (A226-27).

Because the Shelton contract was an actual contract and Rowland was actually paid pursuant to its terms, it cannot comprise a "falsified" document. Accordingly, the conviction on Count Three should be reversed.

### D. The Jury's Verdict on All Counts Should Be Vacated Because of Prejudicial Spillover

The Government does not dispute that if (1) the evidence on Count One were legally insufficient, (2) the Greenberg-related evidence were otherwise inadmissible, and (3) the Greenberg-related evidence prejudiced Rowland's defense on the remaining counts, the verdict cannot stand. Because the Greenberg-related evidence would not have been admissible under Rule 404(b), and because admission of this evidence was not harmless, Rowland is entitled to a new trial on the remaining Wilson-Foley-related counts.

#### 1. The Greenberg-Related Evidence Would Not Have Been Admissible Under Rule 404(b)

In assessing whether evidence is properly admitted under Rule 404(b), courts consider whether

> (1) it was offered for a proper purpose; (2) it was relevant to a
> material issue in dispute; (3) its probative value is substantially
> outweighed by its prejudicial effect; and (4) the trial court gave an

13

> appropriate limiting instruction to the jury if so requested by the
> defendant.

*United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012) (internal quotations omitted).

The Government could not have satisfied the predicates for admission under Rule 404(b) in this case.

Rowland never suggested that he be paid for work on the Wilson-Foley campaign through a third party, and Foley never told Rowland or anyone else that Rowland's job at Apple was a sham or that he was being paid for campaign work. (*See* Def. Br. 37-38). Accordingly, Rowland's interactions with Greenberg, Marc Katz and Sam Fischer in 2009 and 2010 had no relevance to the questions of whether (1) Rowland believed he was being paid for work at Apple and (2) whether Rowland did, in fact, work for Apple. Even if the Greenberg-related evidence had minimal probative value regarding these disputed issues (and it did not), that value would have been substantially outweighed by the evidence's prejudicial effect.

In a strained effort to claim that the Greenberg-related evidence would have been admissible under Rule 404(b), the Government echoes the argument it made to the jury, *i.e.*, that Rowland preyed on "independently wealthy candidates" by seeking "lucrative campaign work" with promises that he could get them elected. (Gov't Br. 28). But it was undisputed that Rowland had sought a paid role in the

14

Wilson-Foley campaign, so there was no need to offer Greenberg-related evidence to show that Rowland wanted a job with the Wilson-Foley campaign.

More importantly, the Government used the Greenberg-related evidence for the very purpose prohibited by Rule 404(b): "to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character." Fed. R. Evid. 404(b)(1). The Government's argument that Rowland repeatedly targeted rich political novices to make money is a generalized attack on his character. And the Government used the Greenberg-related evidence to tar Rowland as someone who did things that were "wrong," "illegal" and "didn't smell right." (A105, 133-34, 144-45). The Greenberg-related evidence could not have been admitted for this purpose.

The Government puzzlingly notes that Rowland did not object to the admission of the Greenberg-related evidence pursuant to Rule 404(b). (Gov't Br. 29). Rowland had no reason to lodge such an objection, as the evidence to which Rowland did not object was admissible with respect to Count One (which should have been dismissed before trial and on which the evidence was insufficient). Indeed, the Government does not even argue (let alone cite a case suggesting) that Rowland forfeited his prejudicial spillover argument.

**2.    The Admission of the Greenberg-Related Evidence Was Not Harmless**

The admission of the Greenberg-related evidence was not harmless. The Government itself stated that the Greenberg-related evidence was "one of the most important aspects of the Government's evidence concerning Mr. Rowland's criminal conduct in connection with the Wilson-Foley campaign." (GA854). It is self-evident that the erroneous admission of "one of the most important aspects of the Government's evidence" is not harmless.

Much of the purportedly "overwhelming" evidence identified in the Government's brief is simply a comparison of the amount of work Rowland performed for Apple and for the Wilson-Foley campaign. (Gov't Br. 31). But this comparison proves nothing because, as set forth in Rowland's opening brief (and not disputed by the Government), it is lawful to provide someone with a real job with the hope that they would then volunteer for a campaign. (Def. Br. 47-48). There are no limits on volunteer services. *See* 11 C.F.R. § 100.74. Accordingly, even if "Rowland's campaign work substantially exceeded his involvement at Apple" (Gov't Br. 31), it does not follow that Rowland was guilty of a crime. So long as Rowland understood that he was being paid for his work at Apple, he was free to volunteer for the campaign as much as he wanted.

Further, although the Government makes much of efforts to conceal Rowland's relationship with Apple (Gov't Br. 30), even Foley acknowledged that

16

this was motivated by a desire to conceal the Rowland/Apple relationship from Connecticut's Democratic governor. (A226-27).

The Government also relies on the testimony of Christopher Covucci, who served briefly as Wilson-Foley's campaign manager, regarding Wilson-Foley's alleged statements about the FEC. (Gov't Br. 30). But Covucci's credibility on this point was hotly contested at trial (GA698), and these alleged statements were not made to Rowland.

In sum, the Government rightly acknowledged that the Greenberg-related evidence was one of the most important aspects of the Government's case on the Wilson-Foley-related counts. The erroneous admission of this evidence prejudiced Rowland's defense, and the convictions on the Wilson-Foley-related counts cannot stand.

## II. The Conviction Should Be Vacated Because of the Government's *Brady* Violations

In its brief on appeal, the Government mischaracterizes the memorandum of Wilson-Foley's interview that was provided to the defense. But the Government cannot escape the fact that it failed to disclose Wilson-Foley's statement to the Government that, at the time she conveyed her husband's job offer to Rowland, she believed Rowland was being hired for "a real job, not a 'sham.'" Nor did the Government disclose that the prosecutors pressured Wilson-Foley to change her account, warning her that "whether or not we can come to an agreement to resolve

17

this for everyone comes down this." (A513). The Government now admits that it carried out its implicit threat: because Wilson-Foley refused to tell the Government what it wanted to hear, the Government "temporarily" rescinded Foley's plea offer. (Gov't Br. 45 n.8). The Government also suggests that it withdrew its offer not to prosecute Wilson-Foley because she would not disavow her exculpatory statements. (*See* Gov't Br. 44-45, 48).

If Rowland had known before trial that Wilson-Foley had refused to adopt the Government's version of events even in the face of Government pressure, there is a reasonable probability that the result of the proceedings would have been different. Accordingly, the Government suppressed materially exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and Rowland's conviction cannot stand.

**A.    The Government Suppressed Wilson-Foley's Interview Statements and Her Refusal to Change Her Account**

The Government repeatedly mischaracterizes the record in its attempt to argue that it did not suppress Wilson-Foley's exculpatory interview statements. Prior to trial, the Government produced to Rowland a memorandum of interview (the "MOI") purporting to memorialize Wilson-Foley's interview with the Government. Relevant excerpts of the MOI are reproduced in both parties' appendices. (A456-58, GA866-68).

It is beyond dispute that the MOI does not disclose Wilson-Foley's statement to the Government that, at the time she conveyed her husband's job offer to Rowland, she believed Rowland was being hired for "a real job, not a 'sham.'" (A446, 456-58). Moreover, contrary to the Government's assertion, the MOI does not report that "Wilson-Foley disavowed any knowledge that Rowland's position at Apple was related to his campaign work." (Gov't Br. 32). The MOI states only that Wilson-Foley did not know what happened during her husband's meeting with Rowland, other than that Rowland was going to work for Apple. (GA867). The MOI is silent on the question of whether Wilson-Foley knew or believed that Rowland was being paid for campaign work. (GA866-68). Further, contrary to the Government's argument, the MOI does not state that Wilson-Foley "drew no connection between Rowland's work at Apple and his campaign efforts" or that Wilson-Foley "initial[ly] subscri[bed] to the volunteer theory." (Gov't Br. 40-41).

The Government's reliance on Rowland's pretrial brief arguing that Wilson-Foley was not a coconspirator is misplaced. (Gov't Br. 42). To be sure, Rowland argued both before and during trial that there was no conspiracy. But Rowland's pretrial brief says only that Wilson-Foley told the Government that Rowland worked for Apple. (GA908 & n.4). The pretrial brief cited the MOI, which was (misleadingly) silent on the question of whether Wilson-Foley knew or believed that Rowland was being paid for campaign work.

19

The Government's argument that Wilson-Foley's exculpatory statements were effectively disclosed though the production of a voicemail message from Wilson-Foley's counsel is unfounded. As a preliminary matter, the Government incorrectly states that the voicemail message was left on the day of Wilson-Foley's interview. (Gov't Br. 33, 40). In fact, the Government's discovery letter to Rowland (which will be provided to the Court upon request) states that the voicemail message was left on March 19, 2014 (nine days after the interview). Nothing in the voicemail suggests that it relates to Wilson-Foley's interview (as opposed to statements she made during the alleged conspiracy). (A455). Moreover, Wilson-Foley's attorney's voicemail, unlike her statements to the Government, would not have been "an effective tool in disciplining" her while testifying. *United States v. Mahaffy*, 693 F.3d 113, 131 (2d Cir. 2012) (internal quotations omitted).

Likewise, Wilson-Foley's statements to campaign staffers and the public during the alleged conspiracy are no substitute for her statements to the Government during the investigation. If she had been called as a witness, Wilson-Foley could have simply disavowed her earlier public statements as actions in furtherance of her purported crime. Wilson-Foley could not have so easily disavowed her statements to the Government because she was legally obligated to tell the truth during her Government interview. *See* 18 U.S.C. § 1001.

To be sure, during her guilty plea allocution, Wilson-Foley made some equivocal statements before stating that she thought her "husband's company was paying Mr. Rowland for whatever he did to support [her] campaign." (A494). But these equivocal statements were no substitute for her steadfast insistence, in the face of Government pressure, that she believed Rowland was being hired for a real job at Apple. Although the Government cites to its own district court brief for the proposition that Rowland "was aware of the potential benefits and pitfalls of calling Wilson-Foley" (Gov't Br. 48), it fails to recognize that disclosure of Wilson-Foley's exculpatory interview statements would have changed Rowland's calculus. Rowland would have been able to use Wilson-Foley's interview statements to ensure that Wilson-Foley would refute the Government's theory of the case and its interpretation of the "I get it" email.

Notably, the Government offers no explanation for its representation during trial that it was "still not certain whether Ms. Lisa Wilson-Foley will or will not take the stand" (A162-63), thereby suggesting that Wilson-Foley had adopted the Government's theory of the case. (Def. Br. 43). The Government's representation cannot be squared with its post-trial statement to the District Court that it had not called Wilson-Foley as a trial witness "because of her inability to candidly and unequivocally acknowledge the scope of her conduct." (Gov't Sentencing Mem. in *United States v. Wilson-Foley*, No. 3:14cr65 (JBA) [Dkt. 61], at 9). The

21

Government's gamesmanship at trial, together with its suppression of Wilson-Foley's statements, helped ensure that Rowland would not call Wilson-Foley as a trial witness.

There can also be no dispute that the Government did not disclose that Wilson-Foley would not change her account even in the face of Government pressure. The Government now admits that because Wilson-Foley would not say that she believed Rowland's job was a sham, it "temporarily" rescinded her husband's plea offer. (Gov't Br. 45 n.8). The Government also now suggests that it revoked its offer not to prosecute Wilson-Foley because of her exculpatory interview statements. (Gov't Br. 44-45).

Importantly, the Government mistakenly suggests that Rowland knew that the Government had withdrawn its offer not to prosecute Wilson-Foley because of her exculpatory interview statements. (Gov't Br. 45-45, 48). During cross-examination, Foley testified only that Wilson-Foley originally was not going to be charged, but that the arrangement later changed to a misdemeanor plea offer. (GA296). Foley did not identify a reason for the change, and Rowland did not know of Wilson-Foley's exculpatory interview statements, let alone that the Government had withdrawn its nonprosecution offer in retaliation for them.

In sum, if Wilson-Foley's exculpatory statements to the Government and her steadfast refusal to change her account in the face of Government pressure were

22

not suppressed, then the word "suppress" is meaningless. If the Court were to adopt the Government's view of its *Brady* obligation, prosecutors would be allowed to withhold directly exculpatory evidence on the ground that a defendant should have unearthed what the Government had concealed. That is not the law. *See*, *e.g.*, *Lewis v. Connecticut Commissioner of Correction*, 790 F.3d 109, 121 (2d Cir. 2015). The Government's argument that it did not suppress Wilson-Foley's exculpatory statements and her refusal to change her account in the face of Government pressure should be rejected.

## B. The Suppressed Evidence Was Favorable to the Defense and Material

The Government's arguments on appeal actually illustrate that Wilson-Foley's undisclosed interview statements and her refusal to change her account in the face of Government pressure were favorable to the defense and material. The Government's theory of the case was that Wilson-Foley told Rowland about the alleged plan to evade FEC reporting requirements at the time she conveyed Foley's job offer and before Rowland sent the "I get it" email. Accordingly, in its brief on appeal, the Government repeatedly implies that Wilson-Foley told Rowland about the alleged illicit plan when she communicated Foley's job offer. (*See* Gov't Br. 8, 30, 46). In a district court brief, the Government made this argument explicitly: "Ms. Wilson-Foley communicated to Mr. Rowland the illicit nature of the arrangement." (GA850-51). This theory was critical to the Government, because if

23

Wilson-Foley had not told Rowland about an illegal arrangement, Rowland's "I get it" email—one of the centerpieces of the Government's case—could not have referred to a criminal scheme. (*See* Def. Br. 45). Accordingly, Wilson-Foley's statements directly contradicting the Government's theory of the case were exculpatory, and there is a reasonable probability that, had the statements been disclosed to the defense, the result of the proceeding would have been different.

Notably, the other emails cited by the Government (Gov't Br. 46-47) in no way suggest that, when Rowland wrote "I get it," he meant that he understood that Wilson-Foley had proposed an illegal scheme. It is far more plausible that Rowland meant that he understood why Wilson-Foley had decided not to hire Rowland for a paid role in the campaign.

The Government's assertion that, if Wilson-Foley had testified, she would have either inculpated Rowland or "destroy[ed] her own credibility," does not withstand scrutiny. (Gov't Br. 48). As Rowland set forth in his opening brief, a jury could reasonably credit Wilson-Foley's exculpatory statements and discredit her statements in connection with her guilty plea as being the product of tremendous pressure on her and her family to resolve this matter. (Def. Br. 48-49).

Likewise, Rowland's cross-examination of Foley at trial would have been far more effective if he had known about Wilson-Foley's exculpatory statements and the Government's coercive plea negotiation tactics.

24

As noted in Rowland's opening brief, Judge Arterton did not properly assess the exculpatory nature of Wilson-Foley's statements because she did not recognize that it is lawful to hire an individual for a real job with the hope that the individual would then volunteer for a campaign. (Def. Br. 40, 46-48). In light of this legal error, this Court should not defer to Judge Arterton's assessment of the materiality of the suppressed evidence.

Finally, the Government has no response to perhaps the best evidence that Wilson-Foley's statements were material—the prosecutors' own reaction to them. The prosecutors initially threatened Wilson-Foley, warning her that "whether or not we can come to an agreement to resolve this for *everyone* comes down to this." (A513 (emphasis added)). After Wilson-Foley refused to tell the Government what it wanted to hear, the Government carried out its threat: it "temporarily" rescinded Foley's plea offer and withdrew Wilson-Foley's nonprosecution offer. (*See* A514; Gov't Br. 44-45 & n.8, 48). The prosecutors bluntly explained the reason for their actions: Wilson-Foley's interview "did too much damage." (A514). As the Government recognized, Wilson-Foley's statements were central to the charges in this case. The Government's suppression of these statements requires a new trial.

**III.    The Conviction Should Be Vacated Because of Erroneous Jury Instructions**

**A.    The Theory of the Defense Charge**

The Government's effort to defend the District Court's decision to change Rowland's theory of defense to remove his state of mind defense falls short. First, as set forth in Rowland's opening brief, there was an ample evidentiary basis for the jury to conclude that Rowland understood that he was being paid to work for Apple. (Def. Br. 51). The Government's only retort is a citation to Rowland's email suggesting that JGR Associates should be the contracting party in the Shelton contract (a suggestion that was not implemented). (Gov't Br. 52; GA270). But, as discussed above, even Foley acknowledged that he structured the contract with Rowland to conceal the Apple/Rowland relationship from the administration of Connecticut's Democratic governor. (A226-27). Thus, Rowland's email suggesting "cover" does not preclude a state of mind defense.

Second, the Government overlooks the fact that the District Court did not simply omit Rowland's requested theory of the defense charge. Rather, the District Court *changed* the charge in a manner that would allow the jury to conclude that Rowland's defense depended solely on whether *Foley* believed he was paying Rowland for work at Apple. This was inconsistent with, and prejudiced, Rowland's defense.

**B.    The Requested Charge that Candidates May Personally Pay Campaign Staff**

In attempting to defend the District Court's refusal to accurately instruct the jury on FEC rules, the Government fails to address the fact that it elicited incorrect testimony from Greenberg that payments to campaign consultants from anyone other than the campaign were "wrong" and would be "secret." (A105, 127-28). The Government does not dispute that candidates may personally pay campaign consultants and that such payments must be reported to the FEC. (*See* Def. Br. 52). The question of whether Greenberg's testimony on this point was correct was not a factual one to be resolved by the jury; it was a legal one that should have been resolved with Rowland's proposed instruction. Thus, the Government's argument that there had to be an "evidentiary basis" for the instruction is mistaken. (Gov't Br. 55-56).

Rowland's requested instruction regarding FEC rules was necessary for the jury to properly assess Greenberg's testimony and the propriety of the rejected draft contract. The District Court's refusal to give this instruction prejudiced Rowland's defense.

**C.    The Section 1519 Omission Theory**

For the reasons set forth above in Section I.A.1. and in Rowland's opening brief, the District Court erroneously instructed the jury that a defendant "falsifies a document . . . by knowingly omitting from the document any . . . fact [that] had a

27

natural tendency to influence, or was capable of influencing the government's, here the Federal Election Commission's ("FEC") and/or the United States Department of Justice's, decisions or activities." (A375). Under this instruction, every document is falsified, as no document can include every fact that has a natural tendency to influence, or is capable of influencing any government agency or department.

The Government's attempt to defend the omission instruction by referring to Section 1519's knowledge and intent requirements misses the mark. Section 1519 does not prohibit all actions taken with the intent to impede, obstruct, or influence the Government. *See Yates*, 135 S. Ct. at 1088. Moreover, intent is often established through circumstantial evidence. *See*, *e.g.*, *United States v. Heras*, 609 F.3d 101, 106 (2d Cir. 2010). Accordingly, the intent element would not prevent the Government from bringing Section 1519 felony charges against anyone who prepares a document that fails to mention a fact that some governmental agency deems material.

The Government's argument that the omission instruction was harmless should be rejected. Because the erroneous instruction eliminated the element of falsification from the offense, the instruction may be deemed harmless only if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Mahaffy*, 693 F.3d at 136 (internal quotation

28

omitted). The error cannot be deemed harmless, as the Government specifically urged the jury to convict on the omission theory (A427), and it is difficult (if not impossible) to identify another theory on which the jury could have convicted.

## IV. The Conviction Should Be Vacated Because of Serious Evidentiary Errors

### A. The Erroneous Exclusion of Rowland's Communications with Apple

In his opening brief, Rowland explained that the District Court erroneously excluded on hearsay grounds emails and text messages that were not offered for their truth. (Def. Br. 54-55). In response, the Government does nothing more than summarize the District Court's rulings. (Gov't Br. 60-62). The Government cites no case supporting the exclusion of the emails and text messages, nor can it point to a Rule of Evidence that prevents a nontestifying criminal defendant from offering his emails for non-hearsay purposes. The Government cannot defend the exclusion of this evidence because the District Court's rulings were simply wrong.

Nor can the erroneous exclusion of Rowland's Apple-related communications be excused as harmless error. Brian Bedard's testimony was not an adequate substitute for the excluded documentary evidence because the Government attacked Bedard at trial as a lying coconspirator. (A417, 432-33). The erroneous exclusion of Rowland's communications was particularly damaging, because the prosecutors then mocked Rowland for failing to offer the erroneously

excluded communications in evidence. (GA702 ("[Rowland's counsel] went to great lengths to show you a handful of e-mails from -- between Mr. Rowland and people at Apple, and that's pretty much all there are. Was that the best he could do?"). The prejudicial exclusion of Rowland's Apple-related communications requires a new trial.

**B.      The Erroneous Admission of Opinion Testimony Regarding the Meaning of Rowland's Emails**

Rowland's opening brief explained that, contrary to the Government's arguments, there was no foundation for Foley to opine on the meaning of Rowland's emails. (Def. Br. 56-57). The Government's argument that Rowland forfeited his objection to some of this opinion testimony by failing to object is mistaken. Rowland filed a pretrial motion *in limine* to preclude the admission of this lay opinion evidence. (*See* A17 [Dkt. 104]). The District Court denied the motion. (A177, *see* A27 [Dkt. 174]). This was sufficient to preserve Rowland's objection. *See*, *e.g.*, *United States v. McDermott*, 245 F.3d 133, 140 n.3 (2d Cir. 2001). Foley was in no better position than the jury to understand Rowland's emails, and the Court should not have permitted Foley to interpret them.

**C.      The Erroneous Admission of Hearsay and Opinion Testimony from Katz and Fischer**

In his opening brief, Rowland argued that the District Court erroneously permitted Katz to opine that Rowland's alleged proposal to Greenberg "didn't

smell right." (Def. Br. 5, 58). Remarkably, in its brief on appeal, the Government does not even attempt to defend the admission of this testimony, which was not relevant to any issue in the case. Because the Government used Katz's testimony to tar Rowland as an unsavory character, a new trial is warranted.

Further, the Government concedes, as it must, that it improperly used Katz's hearsay testimony to argue to the jury that Rowland had proposed to Greenberg that he be paid through the Simon Foundation. (Gov't Br. 67 n.13). Two improper references to inadmissible hearsay cannot be deemed "fleeting." (*Id.*). In light of the Government's summation, its assertion that it offered hearsay testimony for a proper purpose is not credible. *See United States v. Gomez*, 617 F.3d 88, 91 (2d Cir. 2010). In fact, there was no proper purpose for this testimony. The alleged Simon Foundation proposal was not necessary background to Katz and Fischer's testimony. They could have simply testified accurately that they were meeting with Rowland to discuss his desire to work for the campaign. In light of the District Court's erroneous admission of Katz and Fischer's hearsay and opinion testimony, the jury's verdict cannot stand.

## V. The District Court Erred in Calculating the Guidelines Offense Level

The District Court's Guidelines offense level calculation was based on the premise that, so long as Foley had hired Rowland because he wanted to help his wife's campaign, Rowland's entire salary should be treated as an "illegal

31

transaction" under U.S.S.G. § 2C1.8(b)(1). This is mistaken. The District Court assumed that Rowland provided at least $5,000 in services to Apple (A534), and Foley admitted that when he hired Rowland, he thought Rowland could be of value to Apple. (A221). Under these circumstances, the value of the illegal transaction was at most $30,000, and Rowland's total offense level should have been two levels lower. Accordingly, Rowland's sentence cannot stand.

## CONCLUSION

The judgment of conviction should be reversed.

Respectfully submitted,


 s/ Andrew L. Fish
Andrew L. Fish
R. James DeRose, III
Locke Lord LLP
3 World Financial Center
New York, NY 10281
(212) 415-8541
afish@lockelord.com

*Counsel for Defendant-Appellant*

**Certificate of Compliance with Fed. R. App. P. 32(a)**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, as measured by Microsoft Word, this brief contains 6,925 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14 point font for text and footnotes.

s/ Andrew L. Fish
Andrew L. Fish
Locke Lord LLP
3 World Financial Center
New York, NY 10281
(212) 415-8541
afish@lockelord.com
